499 P.2d 699

**The STATE of Arizona, Appellee,**

v.

**Richard M. FORD, Appellant.**

**No. 2313.**

Supreme Court of Arizona,
In Banc.

July 13, 1972.

Rehearing Denied Sept. 12, 1972.

**406**

Gary K. Nelson, Atty. Gen. by Mary Z. Chandler, Asst. Atty. Gen., Phoenix, for appellee.

Harlan Heilman, Yuma, for appellant.

HAYS, Chief Justice.

This is an appeal by the defendant who was sentenced to life imprisonment after a jury found him guilty of murder in the first degree, committed in Yuma, Arizona.

The evidence is entirely circumstantial and fills nearly five hundred pages of transcript. The victim, Gayla Figueroa, a married woman with two small children, obtained her husband's permission to visit a Miss Glendora Finley, and left home at about 7:30 that evening in her Volkswagen. She had previously been invited to a party at the home of Linda Gann who had asked her to bring Glendora along. Linda and Betty Coburn arrived at Glendora's place about 8:00 P.M. to see whether Gayla and Glendora were coming to the party. While waiting for Glendora to dress, they began drinking beer, and continued until 10:00 P.M., when all four left for Linda's place in Linda's car. The party at Linda's was attended by approximately ten men and women who were all drinking beer or hard liquor. At about 11:00 P.M., Linda and Gayla left and went to get coffee and a snack at a cafe, where they remained until about 1:00 A.M. Sunday. Linda then took Gayla to Glendora's home where Gayla got in her car and started for her own home.

Gayla's husband spent the evening at home. He had fallen asleep watching television. At 1:00 A.M. he was awakened by

a loud noise. He checked the children in their bedroom and then went outside, where he saw Gayla's green Volkswagen unoccupied. As he walked around it, he noticed a hole in the door glass on the driver's side. He also noticed that a small foreign station wagon with a luggage rack on its top had just backed out of the Figueroa driveway and was driving off. It was too dark to ascertain its color or who was in it. In the Volkswagen were his wife's keys and her purse, which contained $87 out of the $100 he had given her that day to buy Christmas presents for their children. He returned to his house and went to bed!

Early Sunday morning his father-in-law arrived to awaken Gayla and see that she got to work on time. When it appeared that her bed had not been slept in, the car was again examined, and her father, convinced that the hole in the car's glass was from a bullet, called the police.

Defendant was stationed at the Marine base near Yuma, but he lived in Yuma, and on that Saturday night he was in Yuma after working hours. He owned and drove a small red Opel (foreign) station wagon with a luggage rack on its top. During the evening he drank beer with two male friends from 10:00 until after midnight. During that period he showed them a .38 caliber pistol which he carried and which was loaded with a distinctive type of ammunition called "wadcutter." These bullets have flat noses and are used for target practice because they cut sharper holes in the target than conventional bullets. Sometime near 12:30 A.M. Sunday, he left his friends. There is no evidence to place him outside the Figueroa house at 1:00 A. M. except Mr. Figueroa's testimony that defendant's Opel is the same size and shape as the one he saw driving away shortly after the noise awakened him.

Sunday afternoon Gayla's naked body was found floating in the backwaters of the Colorado River in a heavy growth of salt cedar trees. Her clothes were never found. There was a narrow path through the growth to the water's edge where tire tracks were found. The wheelbase and the distance between the two rear wheels closely matched those of defendant's Opel, which was found several days later at his mother's home in Salt Lake City. Casts of the tire marks were sent to the F.B.I. laboratory in Washington for comparison with the tires on defendant's car, but no evidence was introduced to show that they matched.

A closer examination of Gayla's car revealed that a bullet had passed through the left door glass, through the car, and into the right door, where it was found between the inner panel and the outside metal skin of the door which was dented from stopping the bullet. The slug proved to be a .38 caliber wadcutter fired from a Smith and Wesson pistol. A clerk from the Marine base testified that she had sold a .38 caliber Smith and Wesson pistol and wadcutter ammunition to defendant prior to the murder.

A hair on the floor mat of defendant's car was also analyzed by the F.B.I. laboratory. It could not be proved that it came from Gayla's head but it was the same type as her hair, and could have been hers. On defendant's car, authorities were able to find a sprig of salt cedar, of the same type as that which grew near where the body was found, but which also grew in hundreds of other places in the Yuma area.

Defendant did not take the stand, but he gave a statement to the Royal Canadian Mounted Police who apprehended him in Canada. His story indicated that on Saturday night, October 10, he was drinking with three male friends (who testified that all four drank beer from about 10:00 P.M. until 12:30 A.M. when defendant left). Defendant's statement indicates that he was "feeling remorseful" because of his mother's pending divorce, so he drove to Phoenix, arriving at "about 3 or 4 in the morning." There, he found that she had gone back to her home in Salt Lake City, so he drove back to Yuma, arriving there "at 6 or 6:30." In Yuma, he picked up his

wife and daughter and drove back to Phoenix, leaving Yuma at about 8:00 A.M. Sunday. A Phoenix motel manager testified that all of them checked into her motel at about 10:30 Sunday morning. They shopped for maternity clothes for his wife, but few stores were open on Sunday, so they drove back to Yuma. On the way back, he decided he was going to desert the Marines and go to Canada. He called his superior at the Marine base and told him that his daughter was sick and that he wouldn't be in for duty Monday. They then drove to Salt Lake City where he left his wife, child and car, and was driven to Canada by his sister and her husband.

While in custody of the Canadian police, he called his wife, who by then was living in Pennsylvania. In that conversation she told him that the car had been impounded and he asked: "Did you clean it up? Did you wash it up?"

A post mortem was done on Gayla's body. It disclosed several contusions of the scalp and numerous abrasions all over the body. It indicated that she was dead when she was put in the water. Two fingernails were broken. She died from suffocation, but there was no evidence of manual strangulation. When defendant was apprehended, he had scratch marks on his neck. No examination was made to ascertain whether there was sperm in her vagina which was not lacerated. The head bruises were severe enough to cause unconsciousness but not enough to cause death. There was no bullet wound. The alcohol content of her blood was .02.

Fingernail scrapings were sent to the F. B.I. laboratory but no testimony was introduced as to the results of the analysis. No examination for fingerprints was made of Gayla's car.

We have set out most of the facts because defendant raises eleven issues which refer to them. The jury, by its verdict, has found that the facts point to defendant's guilt beyond a reasonable doubt. It is not within the province of an appellate court to upset a verdict which is supported by substantial evidence. State v. Burrell, 106 Ariz. 100, 471 P.2d 712. On appeal, the evidence will be viewed in a light most favorable to the state. *Ibid.* It is not the function of this court to retry conflicts in evidence. State v. Andrews, 106 Ariz. 372, 476 P.2d 673.

The judgment of the superior court, therefore, must be affirmed unless the court made one of the errors in law pointed out in defendant's brief. These alleged errors, with the numbers assigned to them by defendant, are:

I

Did the court err in denying defendant's motion for a bill of particulars?

The information charged that the defendant, on or about October 11, 1970, in the county of Yuma, murdered Gayla Ruth Figueroa in violation of A.R.S. §§ 13-451, 452, and 453. Defendant's motion for a bill of particulars asked what agency, act or omission caused the death of Gayla Figueroa, when and where the death took place, and the cause of death. The motion admitted that at the preliminary hearing the cause of death was given as asphyxiation, but complained that the defense had no information as to how, when and where death occurred.

Rule 120, Rules of Criminal Procedure, 17 A.R.S., provides:

"An . . . information need contain no allegation of the means by which the offense was committed, unless such allegation is necessary to charge the offense under Rule 115."

Rule 116, Rules of Criminal Procedure, provides for the ordering of a bill of particulars containing "such information as may be necessary" to enable the defendant to prepare his defense. It also provides that in determining whether the motion should be allowed, "the court shall consider the whole record and the entire course of the proceedings . . . ."

We have held that the granting of a bill of particulars rests in the sound discretion of the court. State v. Benham, 58 Ariz.

129, 118 P.2d 91. We have also held that our constitution and the rules cited above "cannot be ignored or treated lightly." *Ibid.*

We believe that a trial court should exercise its discretion in favor of seeing that the accused is furnished with every fact necessary to prepare the best possible defense. The modern trend in discovery proceedings is to have the winner determined by the facts, rather than by which side is the most ingenious in "playing the game."

In the instant case, it would not have helped defendant to grant his motion, because the prosecution did not have the information that he wanted. Even when the trial took place, the state was unable to prove the cause of death more particularly than "asphyxia." Its expert could not state that the asphyxia was caused by any human agency. It made no attempt to prove the time of death or the place of death, for the simple reason that it did not have that information. Therefore, error, if any, in the instant case was not prejudicial.

## II

Did the court err in denying defendant's motion to produce certain documents?

Prior to the trial, defense counsel requested leave to inspect and copy various items in the possession of the prosecution. Some of the items requested were granted.

In his brief the defendant has referred specifically to the failure of the court to order the production of the intercepted telephone conversation in Canada which was reduced to writing. However, he has failed to indicate in what regard he was prejudiced. The production of documents is a matter solely within the sound discretion of the judge. State v. Colvin, 81 Ariz. 388, 307 P.2d 98 (1957). No abuse of discretion has been shown here.

With regard to the failure of the state to produce a copy of the autopsy report before trial, we view this also as non-prejudicial. Had the report given the time, place, or actual manner of death, defendant would have suffered from the lack of information essential to the preparation of his defense. Such was not the case. The only item in the report useful to the defense was the alcohol content of the dead girl's blood. This was .02. Using this as a starting point, defense counsel was able to build as good an alibi as he could have built had he been given a copy of the report before trial. He showed by various witnesses approximately how much beer the victim had drunk between 8:00 P.M. and 11:00 P.M. on Saturday, and how fast the body of a girl of her weight dissipates such alcohol. From that, he made a case that tended to show that Gayla could not have died until 8:00 A.M. or 10:00 A.M. Sunday, at which time defendant must have already left Yuma to enable him and his family to register at the Phoenix motel by 10:30 A.M. The difficulty with that theory, however, was that the exact amount of beer drunk by Gayla could not be proved. No one at the party could be positive whether she had eight or twelve glasses, or less, what size the glasses were, or whether she drank the entire contents of each glass. The jury obviously was not impressed by defendant's theory.

## III

Did the court err in permitting witnesses to testify for the state, when they had not been timely endorsed upon the information?

Rule 153 of the Rules of Criminal Procedure provides that the names of all witnesses upon which an information is based must be endorsed thereon before it is presented, and that the county attorney shall endorse thereon, at such time as the court may rule, the names of all other witnesses he intends to call. In this case, on motion of defense counsel, the court ordered the county attorney to make the required endorsements on the information by December 25, 1970. The county attorney failed to get the names so endorsed until

January 7, 1971, at which time he endorsed the names of 28 witnesses. Trial began January 26, 1971. The county attorney endorsed the names of John Phipps and Jerry Rogers the day before the trial, the name of DeWayne Wolfer on the second day of the trial, and the name of Amelia Trevino on the third day of the trial.

Some counties (Maricopa, for example) have special rules requiring endorsement of the names of all witnesses at least five days before trial. Even in such cases, we have held that a violation of the rule does not automatically disqualify the witness. The decision is a matter for the trial court's discretion. State v. Sherrick, 98 Ariz. 46, 402 P.2d 1, cert. denied, 384 U.S. 1022, 86 S.Ct. 1938, 16 L.Ed.2d 1024. In the event of genuine surprise, the court may remedy the situation by granting the defendant a continuance, but only if the defendant applies for one at the earliest opportunity and it is necessary in the interests of justice. We are unable to find any five-day rule in Yuma County, so that the instant case is governed only by Criminal Rule 153.

In the instant case, Rogers was called by the state to identify the location where the body was discovered, and to identify a picture of the body which he took. No prejudice can possibly be demonstrated by permitting this witness to testify, and no objection was made by defense counsel at that time.

Witness Phipps was called merely to account for the custody of the wadcutter bullet removed from Gayla's car. His testimony was purely routine; there was no objection by the defense, and no cross-examination. It could not possibly have caused any prejudice to defendant.

Both Rogers and Phipps had been called by *defendant* at the preliminary hearing.

DeWayne Wolfer was a ballistics expert brought in by the prosecution from Los Angeles on the second day of the trial. His name was not then endorsed on the information, and the defense had no prior notice. Objection was made by defense counsel when he was called, and the matter was argued outside the presence of the jury. The witness identified the bullet as a .38 caliber wadcutter "reload" which means that it had been reloaded after it left the factory. He also testified that it had been fired from a Smith and Wesson revolver. His testimony was a slight help to the prosecution. Most of the time spent in examining and cross-examining him was wasted in an attempt to get him to state something definite about the appearance of automobile glass broken by a hypothetical bullet. In no case was either side able to get a useful answer because neither side could give him enough facts upon which to base an unequivocal answer. No prejudice could have resulted from the court's ruling that the witness could testify.

On the third day of the trial, the county attorney asked leave to call Amelia Trevino who had not been endorsed on the information. He offered to allow defense counsel to talk with her before she testified. Defense counsel asked for a short recess to talk with her. This was granted and took place off the record. The court then asked whether there was any objection to calling her and defense counsel replied that he objected because she was not endorsed on the information and he had had no notice whatever of the state's intention to call her.

She was permitted to testify that she was a sales clerk at the Marine Corps Base and that nine months before the murder she had sold defendant a .38 caliber Smith and Wesson revolver. On cross-examination she stated that she had also sold defendant some wadcutter ammunition prior to the murder.

The use of this witness is governed by the same Criminal Rule and by the *Sherrick* case, *supra*. Defense counsel did not request a continuance. We find no reversible error in the action of the trial court with regard to any of the above witnesses.

*See* State v. Chitwood, 73 Ariz. 161, 168, 239 P.2d 353, 358, where we held:

"[E]ven if the county attorney had neglected through oversight or otherwise to indorse Bayer's name upon the indictment . . . such omission would not of itself justify the trial court in granting the motion for a new trial. . . . [D]efendant asked for no continuance. The presumption is that he needed none and the law is that he waived any legal right which he had to challenge the propriety of the testimony given by Bayer."

## IV

Did the court err in allowing a Canadian policeman to testify concerning a statement made to him while in custody in Canada?

Upon his arrest, defendant was given both the American *Miranda* warnings and the Canadian warnings. The latter consist merely of a statement that the accused is *not obligated* to say anything, but if he does, anything he says "may be given in evidence." Defendant indicated that he understood his rights and stated, "I do not wish to waive my U.S. rights." Two Canadian police officers sat across the table from defendant while one of them questioned the prisoner. Defendant asked his questioner to make a carbon copy of what he wrote down during the questioning. Defendant answered questions, and when the session was over, the officer asked him if it was correct. Defendant suggested certain corrections which were made, and then acknowledged the correctness of the statement but refused to sign it. The answers were given freely and voluntarily, with no promises or inducements. Defendant asked whether a lawyer would be appointed for him and was told that he could apply for one, but that it was doubtful whether one could be obtained. He never specifically asked for a lawyer or indicated that he did not want to talk in the absence of counsel. All he said was that he didn't want to waive his U.S. rights.

Defendant's theory is that his refusal to waive his U.S. rights required that the of-

ficer at once cease the questioning until a lawyer could be procured; that since one could not be procured, further questioning was involuntary under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Defendant quotes from *Miranda,* that:

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."

The Canadian police officer's uncontradicted testimony was to the effect that defendant never asked for a lawyer, never indicated that he wished to remain silent, and answered all questions voluntarily. Obviously, the rule of *Miranda* is inapplicable, even if it were held to have extraterritorial effect.

The court made a finding, out of the hearing of the jury, that the statement was given voluntarily, and it was admitted. During the voluntariness hearing, defendant testified that he thought that he was being arrested merely for being AWOL but that after his questioning was completed, the officer handed him the warrant and asked him to read it again, which he then did.

There is nothing in defendant's statement which inculpates him, and many of the items in it were proved independently by the testimony of other witnesses. Defendant makes no claim that the statement was obtained by threats or promises. He claims only that it was obtained in violation of *Miranda.* We do not agree.

The warnings enunciated in *Miranda* evolved from a line of cases which began with Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1090 (1961), in which the Court said:

"[T]he purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' "

It is not the purpose of the rules in *Mapp* and *Miranda, supra,* to teach the Ca-

nadian police that their efforts will be wasted if they do not follow our basic laws. We have no extraterritorial jurisdiction even if that were our purpose.

California has held that an American who leaves the country, takes the risk that if he is apprehended there, the procedural safeguards of his native country may not be applied. People v. Helfend, 1 Cal.App. 3d 873, 82 Cal.Rptr. 295, cert. denied, 398 U.S. 967, 90 S.Ct. 2182, 26 L.Ed.2d 551.

This court, in State v. Lombardo, 104 Ariz. 598, 457 P.2d 275, held that private security police, not controlled or paid by any law enforcement body, were not obligated to give *Miranda* warnings. *See also* Stonehill v. United States, 405 F.2d 738 (9th Cir.), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747.

### V

Did the court err in permitting a Canadian police officer to testify as to the contents of a conversation on which he eavesdropped?

The record shows that defendant, while in custody in Canada, was permitted to make a call, and that he made it to his wife, who was residing in Pennsylvania. One officer guarded him during the conversation, and the other listened on an extension in another room, unknown to defendant. The officer on the extension testified at the trial that defendant asked his wife whether she had cleaned and washed his car, which he had left with her when he fled to Canada. Eavesdropping of this sort, according to the testifying officer, was legal in Canada and was done to make sure that defendant was not arranging to be "rescued" by friends.

Defendant argues that although the eavesdropping might not have been illegal under Canadian law, the divulging of the conversation overheard was illegal under United States laws, and no court should permit a crime to be committed from its own witness stand.

The pertinent federal statute is 18 U.S. C.A. § 2515. It provides that whenever a wire or oral communication has been intercepted, no part of the contents may be received in evidence in any trial *"if the disclosure of that information would be in violation of this chapter."* (Emphasis added). 18 U.S.C.A. § 2511 makes it a felony to intercept any wire or oral communication, or to disclose the contents knowing that they had been intercepted.

■ We interpret these sections, read together, to mean that the contents of a message may not be received in evidence *if the message was intercepted in violation of the statute.* In the instant case, the message interception did not violate any statute of the United States, since it took place in Canada. *See* Cross v. State, 235 Ga. 760, 171 S.E.2d 507, 510. There is testimony to indicate that the interception did not even violate any law of Canada.

■ In our opinion, the conversation was also admissible under the Wong Sun doctrine, 371 U.S. 471, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453. In that case the Court said:

"The essence of a provision forbidding the acquisition of evidence in a certain way . . . does not mean that the facts thus obtained become sacred and inaccessible. *If knowledge of them is gained from an independent* source they may be proved like any others . . . ." (Emphasis added).

In the instant case, the presence of another officer in the room with defendant, allowed the state to learn of the conversation without using the information gained from the interception of the conversation. To remand and allow the same conversation to be introduced through the mouth of the other officer would serve no useful purpose, and goes to show that the admission of the evidence, if error, was not prejudicial. One can hardly complain of a violation of his right to privacy when he carries on his conversation in the presence of a police officer.

### VI

■ Did the court err in interrogating the state's witnesses with leading questions,

thereby establishing a foundation for admitting a telephone conversation in evidence?

There is no prohibition against a judge's asking leading questions, and counsel has not cited any cases in support of this proposition. The action complained of occurred in a hearing outside the presence of the jury and hence is even less subject to objection. We find no merit to this contention.

## VII

▇ Did the court err in failing to interrogate the jury when defense counsel informed the court that the foreman made a telephone call during dinner, after the jury's deliberations had commenced? The court asked defense counsel whether he wished to call any witnesses regarding that event, and counsel stated that he did not wish to call any witnesses or make any record of any objection, but that he did want the court to call the jury from its deliberations and ask just whom had been called and about what.

We think that the record of any objection is too feeble to merit attention at the appellate level. State v. Thurston, 100 Ariz. 297, 413 P.2d 764.

## VIII

Did the court err in refusing to direct a verdict for defendant?

Defendant reviews the entire testimony, under this allegation of error. We have set out most of the pertinent evidence in the case, and are convinced that there was enough circumstantial evidence properly admitted, to justify submitting the case to the jury.

## IX

Was the verdict of the jury contrary to law and to the weight of the evidence?

This is but another way of stating VIII, *supra,* and the answer is the same. There was substantial evidence that justified submitting the case to the jury, and for the

same reason, there was ample evidence for the jury to return a verdict of guilty.

## X

Did the court err in refusing to grant a new trial, after hearing the testimony of Reggie Minyard?

At the original trial, the witness Minyard testified that he had gone to the water's edge to fish, and had discovered the floating body of Gayla Figueroa. He also testified that "[i]t appeared to me that something heavy had been drug across the ground there." When the prosecutor asked whether he meant "something like a body," the answer was "Yes."

At the motion for a new trial, it was proved that the naval intelligence officer at the Marine base had told all of the Marines not to talk to defense counsel before the trial. Minyard was one of those so advised. After the verdict, Minyard contacted defense counsel and was put on the stand in connection with defendant's motion for a new trial. While the motion was not on the ground of newly-discovered evidence, Minyard's testimony was taken on that theory. He stated that he had fished in those waters frequently; that he had often seen others do so; that those others often caught a large number of catfish which they put in gunny sacks and dragged over the ground to their cars; and that the tracks left by those gunny sacks appeared essentially the same as those which he observed and had attributed to the dragging of Gayla's body. Minyard testified that he had told this to naval intelligence and that they had forbidden him to talk to anyone but the prosecution, so he had not mentioned the fact on the stand during the trial, and had not mentioned it to defense counsel when he was interviewed as a prospective witness.

▇ This is hardly "newly-discovered evidence." The witness was available and on the stand. A simple question of whether the drag marks could not have been caused by something other than a body

would have elicited an affirmative reply. There is no claim that the witness lied.

■■■ In granting a new trial on the ground of newly-discovered evidence, the trial court has a wide range of discretion. State v. Urry, 104 Ariz. 244, 450 P.2d 1018. As a general rule, a new trial for newly-discovered evidence will not be granted to permit the introduction of testimony of a witness whose identity was known by the moving party at the time of the trial. *Ibid.* Defendant's position is that because the witness had been directed not to talk with defense counsel, the latter could not have discovered the evidence before the trial. However, not only the cross-examiner but also all of the jurors could hardly help knowing that when the witness said that it looked like "something heavy had been drug across the ground," he was saying that it could have been something other than a body. Since the witness hadn't seen what was "drug," it was obvious to the jury that it was anyone's guess what the object was, even without the questions being asked on cross-examination. It is very doubtful whether the new testimony would have had any effect on the jury's verdict, and without such proof, it is not error to refuse to grant a new trial. State v. Murphy, 107 Ariz. 109, 482 P.2d 872.

### XI

Did the court err in admitting a photograph of the victim's body?

■■■ Defendant argues that the photograph was not needed to prove any part of the state's case and that it was "gruesome and grotesque and could only serve as inflammatory matter." The state argues that the pictures helped identify the victim, locate the scene of the body's discovery, and explain the testimony of the medical examiner. The objection that the picture was unduly gruesome carries no weight in this court when the picture has not been forwarded to us to examine. It is the duty of counsel who makes this type of objection, to see that the record before us contains the material to which he takes

exception. State v. Brooks, 107 Ariz. 364, 489 P.2d 1.

The judgment of the superior court is affirmed.

CAMERON, V. C. J., and STRUCK-MEYER, LOCKWOOD and HOLOHAN, JJ., concur.