[No. 3784–II. Division Two. May 7, 1980.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT F. MEYER, *Appellant.*

*Brian P. Coughenour,* for appellant.

*Grant S. Meiner, Prosecuting Attorney,* for respondent.

REED, C.J.—Robert F. Meyer was convicted for theft in the second degree for having obtained property by writing a number of checks without sufficient funds to cover them. The principal issue is whether the State could properly aggregate the checks—none of which exceeded $250 in value—to obtain a conviction for second–degree theft under

RCW 9A.56.040, which requires theft of property or services in excess of $250. A related issue is whether the State should have relied upon the general theft statute at all, rather than the more specific statute prohibiting issuance of bad checks, RCW 9A.56.060. A third significant issue is whether defendant was improperly deterred from taking the stand in his own behalf by the State's proposed use of Canadian convictions to impeach him, when there was no indication he had been assisted by counsel in those Canadian proceedings. We hold it was improper to aggregate the checks to secure a conviction of second–degree theft, and remand for resentencing on the lesser included offense of third–degree theft.

The facts are undisputed. Defendant opened a checking account in Port Angeles with a $20 deposit on August 8, 1978. He then began writing checks on that account to various businesses without making further deposits. Between the 8th and 10th of August, he wrote at least seven checks totaling nearly $600. Some of them were used to obtain cash and others to obtain a vehicle, fishing gear, and a haircut. One of the checks, to J. C. Penney Company, in the amount of $127.69 for a suit, was not accepted by the store after a salesclerk called the bank to verify the check. No single check was in excess of $250.

RCW 9A.56.050 defines the gross misdemeanor of third–degree theft as the theft of property or services which does not exceed $250 in value. Theft of property or services of a value in excess of $250 is a class C felony, RCW 9A.56.040. The prosecution in this case, realizing that none of the checks was for more than $250, nevertheless charged defendant with a felony in reliance upon RCW 9A.56-.010(12)(c):

> Whenever any series of transactions which constitute theft, would, when considered separately, constitute theft in the third degree because of value, and said series of transactions are a part of a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all said transactions shall be the

value considered in determining the degree of theft involved.

A similar aggregation statute exists for possession of stolen property, RCW 9A.56.010(12)(d).

Defendant argues that as the legislature enacted aggregation statutes for both theft and possession of stolen property, but has only recently done so specifically for the writing of bad checks, it must have not intended to countenance the aggregation method of making out a felony for bad checks. He argues further that the State should have been required to charge under the specific bad check statute, RCW 9A.56.060:

> Unlawful issuance of checks or drafts. (1) Any person who shall with intent to defraud, make, or draw, or utter, or deliver to another person any check, or draft, on a bank or other depository for the payment of money, knowing at the time of such drawing, or delivery, that he has not sufficient funds in, or credit with said bank or other depository, to meet said check or draft, in full upon its presentation, shall be guilty of unlawful issuance of bank check. The word "credit" as used herein shall be construed to mean an arrangement or understanding with the bank or other depository for the payment of such check or draft, and the uttering or delivery of such a check or draft to another person without such fund or credit to meet the same shall be prima facie evidence of an intent to defraud.
>
> . . .
>
> [(3) When any series of transactions which constitute unlawful issuance of a bank check would, when considered separately, constitute unlawful issuance of a bank check in an amount of two hundred fifty dollars or less because of value, and the series of transactions are a part of a common scheme or plan, the transactions may be aggregated in one count and the sum of the value of all of the transactions shall be the value considered in determining whether the unlawful issuance of a bank check is to be punished as a class C felony or a gross misdemeanor.[1]]

---

[1]Section 3 was added to the statute by Laws of 1979, 1st Ex. Sess., ch. 244, § 14, effective July 1, 1979—after the date of the trial in this case. The result is that

(4) Unlawful issuance of a bank check in an amount greater than two hundred fifty dollars is a class C felony.

(5) Unlawful issuance of a bank check in an amount of two hundred fifty dollars or less is a gross misdemeanor.

■■ We first dispose of the argument against charging under the general theft statute rather than the specific bad check statute—an argument which we need not consider as it was not expressly raised at trial. *State v. Wicke,* 91 Wn.2d 638, 591 P.2d 452 (1979). We need not tarry long over this issue. In *State v. Wilder,* 12 Wn. App. 296, 529 P.2d 1109 (1974), we considered a similar argument under RCW 9.54 of the former criminal code. In *Wilder* the defendant wrote a worthless check in exchange for cash. She obtained property—cash—from the merchant who accepted the check; her act was then defined by former RCW 9.54.010(2) and former RCW 9.54.090(5) as grand larceny. She argued that her act instead fell exclusively within RCW 9.54.050, which made out a gross misdemeanor in language virtually identical to that in RCW 9A.56.060, except that the actor was guilty of "larceny" rather than "unlawful issuance of bank check." We observed in *Wilder* that the elements of the crime of writing a check upon an account without sufficient funds were quite different from the elements of larceny accomplished by obtaining property of another by writing a bad check. *See, e.g., Persinger v. Rhay,* 52 Wn.2d 762, 329 P.2d 191 (1958). The bad check statute was, and is, simply a more specific prohibition of the same conduct constituting larceny. Under the 1976 criminal code the definitions of the two crimes now vary even more, because the writing of a bad check is no longer described as "larceny," and the general definition of theft no longer mentions checks, as did RCW 9.54.010(2) and .090(5). We adhere to *Wilder* and hold that the prosecution was entitled to elect to charge defendant with the theft of

now the prosecution can aggregate a series of checks of $250 or less and charge felony issuance of bank checks when the checks were written as part of a common scheme or plan.

property or services of another, rather than with the unlawful issuance of a bank check.

The more troublesome issue, however, is whether the prosecutor should have been permitted to charge a felony by aggregating the various worthless checks written to different people on different days. We have already determined that defendant was properly charged with theft for his conduct. RCW 9A.56.010(12)(c) allows formation of a felony count by aggregating a series of smaller transactions of thievery only if the transactions "are a part of a common scheme or plan". Aggregation in this way has been permitted if either (1) all the thefts were from the same victim over a period of time, *State v. Perkerewicz,* 4 Wn. App. 937, 486 P.2d 97 (1971), *State v. Vining,* 2 Wn. App. 802, 472 P.2d 564 (1970), Annot., 53 A.L.R.3d 390 (1973), or (2) the thefts were from several people at the same time and in the same place, Annot., 37 A.L.R.3d 1407 (1971). *Vining* holds that it is for the jury to decide whether the thefts were part of a common scheme or plan where the property has been stolen from the same owner and from the same place by a series of acts. But we have found no support for the theory that thefts from different people, in different places, over a period of days, constitute a common scheme or plan—"a single, continuing criminal impulse or intent", in the words of *Vining,* at page 808. The weight of authority is that such thefts are separate and cannot be aggregated, absent a specific statutory directive. *See, e.g.,* Clark & Marshall, *A Treatise on the Law of Crimes* § 12.07 (7th ed. 1967); W. LaFave & A. Scott, *Criminal Law* § 87 (1972); 50 Am. Jur. 2d *Larceny* § 3 (1970). *See also State v. Bolen,* 88 N.M. 647, 545 P.2d 1025 (1976). Conceivably, aggregation could be possible if, for example, a person were to defraud related victims such as a husband and wife by a scheme carried out in different places over a period of time. This is not such a case, however. The victims were not affiliated with one another, were in different locations, and were given bad checks on various days. The writing of several checks in the same city over a period of 3 days does

not, by itself, constitute evidence of a common scheme or plan.

We are unconvinced by the State's argument, *i.e.*, that the statutory definition of theft as wrongfully obtaining the property or services of "another," when read together with the direction in RCW 9A.04.110(27) that singular words shall include the plural, means that the thefts from a series of "anothers" can be aggregated. Certainly thefts from different victims can be aggregated in the proper circumstances, but not in this case. The conviction for second-degree theft must fall. As that crime includes the lesser offense of third–degree theft, however, and as the jury had to have aggregated two or more findings of guilt of third–degree theft to arrive at a felony conviction, a conviction for third–degree theft will stand.

We find no merit in the remaining assignments of error but will address them for the sake of completeness.

Defendant contends he was discouraged wrongfully from taking the stand in his own behalf because the court had approved the State's intention to impeach his credibility with 10 misdemeanor convictions incurred in Canada in 1971.[2] The threatened use of these convictions was improper, he argues, because the certified copies of them showed no indication he had been represented by counsel in those prior proceedings. *Loper v. Beto,* 405 U.S. 473, 31 L. Ed. 2d 374, 92 S. Ct. 1014 (1972); *State v. Paul,* 8 Wn. App. 666, 508 P.2d 1033 (1973). The rule is that prior *felony* convictions shall not be used for the purpose of impeachment or enhancement of punishment unless the record of the conviction shows that the defendant was afforded counsel, or waived assistance of counsel, at the prior hearing. Presumably a like rule would apply to the use of misdemeanor convictions obtained in this country if

---

[2]We suspect that defendant was discouraged from taking the stand, if at all, not so much by the 1971 Canadian misdemeanors, as by a 1976 conviction in Kitsap County for grand larceny by embezzlement—the proposed use of which to impeach he has not assigned as error.

the defendant had been sentenced to a term of imprison-
ment for those offenses. *See Scott v. Illinois,* 440 U.S. 367,
59 L. Ed. 2d 383, 99 S. Ct. 1158 (1979).

The record is somewhat sketchy concerning the Canadian
convictions at issue. They are described in the record in
various places as including bad check offenses, defrauding
innkeepers, possession of stolen property, and theft. At
least some of them occurred in British Columbia in 1971.
Defendant's brief describes them as 10 misdemeanors that
"all arose in just one month of 1971." We cannot tell
whether or not defendant had counsel in those cases or if
he was sentenced to jail. The record describes them only as
certified copies of convictions.

Moreover, we respectfully disagree with the state-
ment in *Paul* at page 668 that the question underlying the
use of Canadian convictions "is not whether the laws of
Canada require counsel to be furnished". We think that is
the question at issue, and we think the burden is on the
defendant to demonstrate, both to the trial court and to us
in support of this assignment of error, that Canada
required assistance of counsel in those proceedings. That
has not been shown. The concern in cases of this sort is to
assure that convictions in our country will be obtained only
by adherence to the Sixth Amendment right to counsel. A
conviction obtained in violation of that right is subject to
reversal; hence the requirement that convictions cannot be
used in later proceedings for impeachment or enhancement
of punishment purposes without proof of assistance of
counsel.

Our courts, however, do not have the same interest in
upholding a right to counsel in Canadian proceedings.
Canada's safeguards for criminal defendants are not the
business of courts in this country. *See State v. Ford,* 108
Ariz. 404, 499 P.2d 699, 706–07 (1972). In the analogous
context of police interrogation in a foreign country, United
States courts have admitted into evidence statements
obtained in another country without strict observance of
*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.

Ct. 1602, 10 A.L.R.3d 974 (1966), so long as the statements satisfy other legal requirements for trustworthiness. *See, e.g., United States v. Chavarria,* 443 F.2d 904 (9th Cir. 1971); *United States v. Dopf,* 434 F.2d 205 (5th Cir. 1970); *State v. Cranford,* 83 N.M. 294, 491 P.2d 511 (1971). As stated in *State v. Vickers,* 24 Wn. App. 843, 845, 604 P.2d 997 (1979), "[o]ne of the chief aims of the *Miranda* exclusionary rule is to deter police misconduct; where the police are of a different sovereign, no such deterrent effect would result . . ." *Accord, State v. Ford, supra.* Similarly, by precluding the impeachment use of Canadian convictions on the grounds urged by defendant, we would be refusing to recognize those judgments for a reason peculiar to our constitution and which Canadian law may not require.[3] The doctrine of comity directs that we give full effect to foreign judgments, except in extraordinary cases. R. Leflar, *American Conflicts Law* § 84, at 170 (3d ed. 1977). *See* Restatement (Second) of Conflict of Laws § 98 (1971). Therefore we find no error in the court's ruling for these reasons: (1) defendant has not shown that he was sentenced to confinement as a result of the Canadian convictions; (2) he has not shown us that Canada also required assistance of counsel in those proceedings; (3) unless Canada did require assistance of counsel, comity impels our courts to give full effect to the certified Canadian judgments rather than to the Sixth Amendment standard which applies to proceedings in this country. As the court pointedly

---

[3]The Canadian Bill of Rights § 2(c)(ii), provides that no law of Canada shall be construed or applied so as to "deprive a person who has been arrested or detained . . . of the right to retain and instruct counsel without delay." This means that a person under arrest has a right to call and speak with a lawyer. K. Clarke, R. Barnhorst & S. Barnhorst, *Criminal Law and the Canadian Criminal Code* 91 (1977); S. Cohen, *Due Process of Law—The Canadian System of Criminal Justice* 18–21, 77–79 (1977). Apparently, however, neither the Canadian Bill of Rights nor criminal code requires assistance of counsel at trial. S. Spetz, *Canadian Criminal Law* 163 (1972). The Criminal Code of Canada allows evidence of prior convictions to enhance punishment, section 592(2), and to impeach an assertion of good character, section 593. Such convictions are shown by means of a certificate which need not refer to assistance of counsel in the prior case, section 594.

observed in *People v. Helfend,* 1 Cal. App. 3d 873, 82 Cal. Rptr. 295, 307 (1969), one who enters another country and commits a crime assumes a certain risk that, upon apprehension, he may not be exposed to the same legal, investigative, and interrogative procedures that are customary in this country.

Defendant argues that his right to speedy trial was violated. CrR 3.3(c) required his trial to begin "within 60 days following the preliminary appearance." His preliminary appearance was on August 11, 1978. The case would have been tried on October 10, which was the 60th day as computed by CrR 8.1 and CR 6; however, defendant then moved for a continuance to obtain the appearance of a witness. The trial began on October 18, but as the period of continuance was excludable under CrR 3.3(e)(1), there was no error. In any event, defendant waived this argument by not moving to dismiss prior to trial. *State v. Williams,* 85 Wn.2d 29, 530 P.2d 225 (1975).

Defendant argues further that the court erred by permitting the State to amend the information on the second day of trial to conform to the proof. The amendment, which added a $200 bad check to those previously charged, enabled the State to form a felony count by aggregating all of the checks to go over $250. He knew the check was in the police reports from the start, and he does not specify in what ways he was unable to defend against this particular check. The brief contains no authority for this assignment of error and we need not consider it, both for that reason and because of our previous invalidation of the felony count on grounds of improper aggregation.

Finally, defendant complains of the fact the omnibus hearing date was passed on two occasions; the trial date was twice continued; the State twice failed to provide information to the defense; and the information was twice amended. The cumulative effect of these events, he contends, was to deny him a fair trial because the defense was disrupted frequently. However, the record indicates that the defense did not object to the continuances or to the

missed omnibus dates. The evidence in the form of bank records was supplied more than a week prior to trial, and no prejudice appears. We have discussed the second amendment of the information. The first amendment was on October 4, 1978, and it added nothing new to the acts with which defendant was originally charged. There is no merit to this assignment of error.

The judgment and sentence for second–degree theft are vacated and the cause is remanded for resentencing for third–degree theft.

PEARSON, J., and ARMSTRONG, J. Pro Tem., concur.