Accordingly, I concur in the judgment of the court.

STATE OF NEW JERSEY v. PRIMO V. MOLLICA AND AUGUSTINE FERRONE, DEFENDANTS.

Superior Court of New Jersey
Law Division—Criminal Atlantic County

Decided July 31, 1986.

*Leo P. Cox*, Deputy Attorney General, for State of New Jersey (*W. Cary Edwards, Jr.*, Attorney General).

*B. Dennis O'Connor* for defendant Mollica.

*Francis J. Hartman* for defendant Ferrone, (*Francis J. Hartman*, Chartered).

## OPINION

PERSKIE, P.J.F.P.*

Defendants seek to exclude from evidence documents seized at the execution of search warrants which were issued in reliance upon telephone toll records obtained without judicial warrant by the Federal Bureau of Investigation and turned over to the State Police "on a silver platter." *Lustig v. United States*, 338 *U.S.* 74, 69 *S.Ct.* 1372, 93 *L.Ed.* 1819 (1949). Is the use of the toll records permitted in these proceedings notwithstanding that they could not have been used if obtained directly by the State Police?

---

*Designated to hear this matter by order of Paul R. Porreca, P.J.Cr.

The procedural background for this question must be outlined in detail, as it is, regrettably, somewhat involved and protracted.

In January 1984 the State Grand Jury returned a two count indictment charging defendants with violations of *N.J.S.A.* 2C:37–2, promoting gambling, and *N.J.S.A.* 2C:37–3(a)(1), possession of gambling records. The matter was assigned for trial to Atlantic County.

The State alleges that defendants, while registered as guests at Caesars Boardwalk Regency Casino Hotel in Atlantic City in July 1983, "maintained premises, paraphernalia and equipment ... in connection with a bookmaking enterprise." Executing a search warrant issued by a judge of the Superior Court on July 14, 1983, the State Police arrested defendants in the hotel and confiscated certain records which constitute the principal evidence in support of the State's case.

Defendants moved to suppress that evidence. Incident to the motion, I determined that State Police Detective John Medolla had submitted an affidavit in support of the application for the search warrant in which, in relevant part, he testified as follows:

a. Information was received by me, Det. J. Medolla # 2578, of the New Jersey State Police, from a reliable federal authority who has personal knowledge that sports bets are being accepted by the aforementioned described individual. The source of the FBI's information came about as the result of several anonymous phone calls received during the months of June and July 1983. The anonymous phone caller advised the following: an individual known personally by the caller named AUGUSTINE FERRONE and who is described in Section 3, paragraph 2 is the principal participant in a bookmaking enterprise. He described AUGUSTINE FERRONE as being a large scale lay-off man (Lay-off or edge-off is a term utilized by bookmakers. It refers to a person who accepts large wagers from other bookmakers enabling them to minimize their loses [*sic*]). The caller advised that in the earlier part of May 1983, AUGUSTINE FERRONE occupied a suite of room [*sic*] in Caesars Hotel where he conducted his illegal bookmaking enterprise. The caller explained that the method of operation in which AUGUSTINE FERRONE conducts his illegal enterprise is to call numerous bookmakers throughout the United States for the purpose of receiving their lay-off action. In addition, AUGUSTINE FERRONE calls various sports lines and weather services to obtain the latest conditions as well as the various point spreads. The caller advised that in addition to the

month of May 1983, AUGUSTINE FERRONE has occupied rooms in Caesars Hotel/Casino on numerous occasions at which time he has conducted illegal bookmaking.

b. A check of Caesars telephone records revealed that AUGUSTINE FERRONE did, in fact, occupy a suite of rooms in the earlier part of May 1983 as well as on numerous occasions. This would substantiate the callers [sic], information in regards to AUGUSTINE FERRONE occupying rooms in Caesars.

c. Telephone tolls were gathered during the time frame that AUGUSTINE FERRONE occupied rooms in caesars [sic], they reflected the following:

1. There was an outgoing call placed from Caesars to telephone facility 702-382-1600. A check in the Hill-Donnelly Cross Reference revealed that 702-382-1600 is listed to Binions Horseshoe Hotel and Casino, 128 Fremont Avenue, Las Vegas, Nevada.

It should be noted that the above telephone number appears very frequently on the tolls of sports bookmakers. The number is a 24 hour sports service that lists daily results of sporting events including the odds and the current line.

2. There was an outgoing call placed from Caesars to telephone facility 213-986-9710. The telephone number is known to the Las Vegas FBI office as being listed to Sports Publications, 10548 Victory, North Hollywood, California.

This telephone number furnishes to the caller prerecorded sports line information and sports results.

3. There was an outgoing call placed from Caesars to telephone facility 312-976-1212. The telephone number is known to Chicago FBI office as a National Weather Information Center....

5. Records obtained from Caesars Hotel and Casino reflect numerous toll calls were charged to AUGUSTINE FERRONE [sic] room. A review of those calls indicate a classic bookmaking pattern, i.e. calls were made during the same time period each day and were made in rapid succession....

After the issuance of the search warrant on July 13, but before any execution, Detective Medolla returned to the issuing judge with a "supplemental addition" to the application for a search warrant in the form of an affidavit dated July 14. That affidavit provided the following information:

a. Additional information was received by me, Detective Medolla # 2578, of the New Jersey State Police, from the FBI who has knowledge that sports bets are being accepted by the aforementioned described individual. The same FBI source, who gave the information in regards to Augustine Ferrone's bookmaking operation advised the following:

An individual known personally by the FBI's source named Primo Mollica and who is described in Section 2 Paragraph 1 is an assistant to Augustine Ferrone in his, Ferrone's, bookmaking enterprise. The source advised that Primo Mollica will occupy a suite of rooms during the same time frame as Augustine Ferrone and will be in close proximity of Augustine Ferrone's room at all times.

The function of Primo Mollica is to interface with Augustine Ferrone and to assist with the lay-off action.

b. A check with Caesars Hotel/Casino records revealed that Primo Mollica did, in fact, register in a suite of rooms similar to Augustine Ferrone's rooms. (This would substantiate the FBI's source in regards to Primo Mollica staying in rooms within a close proximity of Augustine Ferrone and registered in Caesars Hotel in the same time frame.) ...

When the judge issued the second search warrant on July 14, the warrants were executed and defendants arrested.

Defendants raised several challenges to the validity of the search warrants. Relevant here is only the claim that the seizure of the toll records without a warrant violated defendants' constitutional privilege against unreasonable search and seizure,[1] and was contrary to the standards established in *State v. Hunt*, 91 *N.J.* 338 (1982). In the *Hunt* decision the Supreme Court held that individuals have protectible interests in the privacy of long distance toll records maintained by the telephone company with respect to calls made from the home. I determined that the doctrine of the *Hunt* decision was applicable to telephone toll records maintained by and obtained from the hotel, reasoning that there was a sufficient expectation of privacy in such records to require judicial process before such records could be seized by the State Police. Relying upon Medolla's affidavits as to the seizure of the records, and the assertion, not then challenged by any party, that the State Police had obtained the telephone toll records from Caesars without warrant, I granted defendants' application for the invalidation of the search warrants and the suppression of the evidence.

The State petitioned the Appellate Division for leave to file an interlocutory appeal of that order. While the application for leave to appeal was pending, but prior to a ruling by the Appellate Division, the State "learned" that, in fact, the State Police had *not* obtained the telephone toll records from the hotel, but rather had received them from agents of the Federal

---

[1]*U.S. Const.*, Amend. IV; *N.J. Const.*, Art. 1, § 7.

Bureau of Investigation. On this basis the State moved before me for reconsideration of the suppression order. Before I could respond to the motion, the Appellate Division granted leave to appeal, and I then determined that I lacked jurisdiction to entertain the reconsideration application until such time as the Appellate Division had ruled on the interlocutory appeal.

In due course the Appellate Division affirmed the order suppressing the evidence. In an unpublished decision [2] the Court noted, "We perceive no material distinction between the expectation of privacy in telephoning from a home and in telephoning from a hotel room. Warrantless searches of hotel rooms have long been held to violate Fourth Amendment rights; evidence seized in such searches has been suppressed" (citations omitted).

The Appellate Division observed:

The State represents as a fact on appeal a factual assertion which was not before the trial court: that it obtained the toll records of defendants' telephone calls not from the hotel but from the Federal Bureau of Investigation. Because, arguably, an FBI seizure was permissible under the Federal Constitution, *see Smith v. Maryland*, 442 *U.S.* 735 [99 *S.Ct.* 2577, 61 *L.Ed.* 2d 220] (1979), the State urges that the toll records are admissible in its courts, as well as in the Federal courts, under the so-called "silver platter" doctrine, *see Lustig v. United States*, 338 *U.S.* 74, 78, 79 [69 *S.Ct.* 1372, 1374, 93 *L.Ed.* 1819] (1949), and not subject to the exclusionary rule under the Fourteenth Amendment.

On appeal we are confined to the record before the trial court ... We cannot consider the State's factual assertion of the source of defendants' toll records, which was neither presented nor proven before the trial court and is not admitted by defendants.

Following a remand "for further proceedings not inconsistent herewith," the State again moved for reconsideration of the suppression order. Defendants resisted this motion, arguing that the affirmance by the Appellate Division of the order suppressing evidence was the law of the case, not subject to "reconsideration" by the trial court. When I agreed with that assertion, the State again sought leave to file an interlocutory appeal. The Appellate Division granted leave to appeal, follow-

---

2Docket No. A-5806-83T5, February 7, 1985.

ing which it reversed the determination that I could not hear the State's application. The matter was remanded for the purpose of holding a factual hearing as to the State's revised allegations of the manner of obtaining the records and the determination of whether to reconsider the suppression order based upon the facts developed at such a hearing.

I found these facts at the hearing. On or about July 7, 1983 Agent Byron of the F.B.I. informed the State Police of the existence of a Federal inquiry and certain records obtained by the FBI. Byron turned over to the State Police portions of the records obtained, including telephone toll records that the FBI had obtained without judicial process from Caesars.

Prior to the call from the FBI, the State Police had undertaken no independent investigation of their own regarding defendants, nor did the State Police have any knowledge of the fact or content of the FBI inquiry. Apart from supplying the State Police with the telephone toll records and selected portions of their investigative reports, the FBI was not involved in the activities of the State Police in seeking or executing on the search warrants. Apart from checking with Caesars as to the registration of defendants in the hotel, Medolla and the State Police did no independent investigation of their own into the allegations that the FBI had received and investigated.

Using the materials obtained from the FBI, Medolla developed the search warrant applications submitted to the issuing judge on July 13 and 14. When the second warrant was issued Medolla contacted Byron, who was present at the time of the execution of the warrants and the arrest of defendants.

For the purpose of this determination I am satisfied that: (1) there was no "collusion" between the FBI and the State Police in the original seizure of the records; (2) the FBI actions were independent of those of the State Police; and (3) the State Police were solely responsible for the application for and execution of the search warrants.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

It is well settled that seizure of records of telephone calls without judicial sanction does not violate the Fourth Amendment prohibition against unreasonable search and seizure, as no "reasonable expectation of privacy" can be said to protect against such a seizure. *Smith v. Maryland,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.2d* 220 (1979). Accordingly, the records here sought to be suppressed could be admitted into evidence in a prosecution in the federal courts.

The State relies upon this fact in arguing in its brief that "as long as evidence is legally seized in the jurisdiction in which obtained, it can thereafter be used by another jurisdiction." The State asserts that because the State Police were not in any way involved in the FBI seizure of the records there is no legal or policy reason to exclude the evidence. The State argues that "exclusion of the tolls given the New Jersey State Police by the FBI, and thereafter used to establish probable cause for the issuance of search warrants, will not deter future illegal conduct of the New Jersey authorities since they were not a party to or even aware of the FBI activities until contemporaneously provided with the statements of the informant and the toll records. Nor will suppression of the seized materials in the State of New Jersey in any way change or deter the way the FBI obtains such materials in the future since they were properly obtained in the first place. On the contrary, the effect will be to create the anomalous result of chilling federal-state cooperation when different law enforcement agencies, acting properly according to the recognized procedures of each jurisdiction, are unable to exchange legally seized evidence."

As has already been observed New Jersey's Constitution has been interpreted as providing a broader protection against the warrantless seizure of telephone toll records than that provided by the Fourth Amendment. *State v. Hunt, supra.* It is thus apparent that, in this difficult and sensitive area, the courts of New Jersey are bound to a somewhat higher standard in permitting the use of such evidence than are our counterparts in the federal system.

This dichotomy is, of course, not unique to issues regarding the admissibility of telephone toll records. A line of recent decisions has made clear the doctrine that our state courts have the affirmative responsibility of interpreting state constitutional requirements even in the context of identical or nearly identical wording of the state and federal Constitutions.

> Art. I, par. 7 of the New Jersey Constitution of 1947 is almost identical in wording to the Fourth Amendment to the federal Constitution. Under our recent cases, we are free to look to our Constitution which on at least four occasions has been construed to afford greater protection to privacy interests than the parallel provision of the federal constitution. *See State v. Hunt,* 91 *N.J.* 338 (1982) (protectible interest in toll billing records); *State v. Alston* 88 *N.J.* 211 (1981) (standing to challenge search and seizure); *State v. Johnson,* 68 *N.J.* 349 (1975) (consent to search); *State v. Novembrino,* 200 *N.J.Super.* 229 (App.Div.1985) (no "good faith" exception to exclusionary rule). Indeed, the United States Supreme Court itself has invited the several states to develop acceptable alternatives to the constitutionally infirm random traffic stops condemned in the leading federal case, *Delaware v. Prouse,* 440 *U.S.* 648, 663, 98 *S.Ct.* 1391, 1401, 59 *L.Ed.2d* 660 (1979): "this holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion." *[State v. Kirk,* 202 *N.J.Super.* 28, 35 (App.Div.1985) (footnotes omitted) ]

In matters of unreasonable searches and seizures our courts are free, and indeed even encouraged, to look to the state Constitution to afford greater protection of the privacy interest of the public than afforded under parallel provisions of the federal Constitution. *State v. Novembrino,* 200 *N.J.Super.* 229, 239 (App.Div.1985), *leave to appeal granted,* 101 *N.J.* 305 (1985).

There are several fundamental purposes for the exclusionary rule:

> (1) To compel respect for the constitutional guaranty [of no unreasonable search or seizure] in the only effectively available way—by removing the incentive to disregard, and (2) to uphold "the imperative of judicial integrity." *Elkins v. United States,* 364 *U.S.* 206, 217, 222, 80 *S.Ct.* 1437, 1444, 1447, 4 *L.Ed.2d* 1669, 1680, (1960). But there is still another consideration or reason for the exclusionary rule. It also serves to restore the victims of the unconstitutional searches and seizures to the position they were in before the illegality occurred. *[Novembrino, supra,* 200 *N.J.Super.* at 238–9]

The *Elkins* decision cited in *Novembrino* presents a precise parallel to the facts of this case. In *Elkins* state law enforcement officers in Oregon seized certain evidence pursuant to a search warrant later determined by the Oregon courts to be invalid. The state courts suppressed the evidence. During the course of the state proceedings federal officers, acting under a federal search warrant, obtained the suppressed evidence from the custody of the state officials and used the evidence to obtain a federal indictment. The Federal District Court, in an action affirmed by the Court of Appeals for the Ninth Circuit, denied the motion to suppress because there was no evidence that any federal officer participated in any way in the original (illegal) search and, in fact, the federal officers first learned about the matter when they read about it in the newspaper.

The United States Supreme Court reversed the convictions and used the opportunity to invalidate the "silver platter doctrine." After noting that the Fourteenth Amendment prohibits unreasonable searches and seizures by state officers, *Wolf v. Colorado*, 338 *U.S.* 25, 69 *S.Ct.* 1359, 93 *L.Ed.* 1782 (1949), the Supreme Court observed that:

... surely no distinction can logically be drawn between evidence obtained in violation of the Fourth Amendment and that obtained in violation of the Fourteenth. The Constitution is flouted equally in either case. To the victim it matters not whether his constitutional right has been invaded by a federal agent or by a state officer. It would be a curiously ambivalent rule that would require the courts of the United States to differentiate between unconstitutionally seized evidence upon so arbitrary a basis. Such a distinction indeed would appear to reflect an indefensibly selective evaluation of the provisions of the Constitution. Moreover, it would seem logically impossible to justify a policy that would bar from the federal trial what state officers had obtained in violation of a federal statute, yet would admit that which they had seized in violation of the Constitution itself. [*Elkins*, 364 *U.S.* at 215, 80 *S.Ct.* at 1443 (footnote and citation omitted).]

The rationale of this holding governs the issue here presented. In *Elkins* the Supreme Court was faced with a motion in a federal trial to suppress evidence properly obtained by federal officers but illegally seized by the state officers from whom the federal agents received it. In this case the facts are precisely the reverse: the evidence was improperly seized by *federal*

officers, was then lawfully obtained by *state* officers, and is now sought to be suppressed in a *state* proceeding. The logic of *Elkins* is compelling. The protection afforded by the state constitutional provision would be eviscerated if the State Police could rely upon evidence improperly obtained by the FBI. This is particularly evident where, as here, the State Police were presented with the time and opportunity to have applied for a warrant permitting their own seizure of the telephone toll records from the hotel.

The State places substantial reliance upon the important decision of the California Supreme Court in *People v. Blair*, 25 *Cal.*3d 640, 159 *Cal.Rptr.* 818, 602 *P.*2d. 738 (1979), a decision relied upon by our own Supreme Court in *State v. Hunt*, 91 *N.J.* 338 (1982). In *Blair* the defendant, a resident of Pennsylvania, was charged with murder in Los Angeles. The FBI, as part of an investigation jointly undertaken with the Los Angeles Police Department, served federal grand jury subpoenaes to obtain toll records of the defendant's Pennsylvania home upon the Philadelphia Bell Telephone Company. The California Supreme Court recognized that such a procedure would have been invalid in California and the records thus obtained inadmissible against the defendant had they been seized in California instead of Pennsylvania. The Court determined, nevertheless, to permit the introduction of the records into evidence with the following discussion:

> From the inception of the exclusionary rule, we have made it clear that the rule has a two-fold purpose: to deter the police from engaging in unconstitutional searches and seizures by removing their incentive to do so, and to relieve the courts from being compelled to participate in illegal conduct. The first of these goals would obviously not be served by exclusion of the evidence in question, for no California law enforcement personnel participated in the seizure of the records from the telephone company in Philadelphia, and since the seizure was not illegal where it occured, exclusion would serve no deterrent effect in either jurisdiction.
>
> The question remains, however, whether the vindication of judicial integrity requires exclusion. The rationale underlying the basis for the rule ... is that it is morally incongruous for the state to flout constitutional right and at the same time demand that its citizens obey the law, that government teaches by

example, and that if the government becomes a law-breaker, its action breeds contempt for the law ...

Defendant urges judicial integrity is compromised in this circumstance so as to outweigh the state's interest in the successful prosecution of crimes committed in this state. We write upon a clean slate, for no direct authority regarding this issue has been cited or found. Reflecting upon the alternatives, we conclude that the principles of *Burrows* [*v. Superior Court*, 13 *Cal.*3d 238, 118 *Cal. Rptr.* 166, 529 *P.*2d 590 (1974)] and [*People v.*] *McKunes* [51 *Cal.App.*3d 87, 124 *Cal.Rptr.* 126 (1975)] were not violated by admission of Vineyard's telephone records at defendant's trial. Defendant was a resident of the jurisdiction in which the seizure occurred. Since the search was legal there, his expectation of privacy was not impaired under the laws of the state in which he resided. Unlike the situation that arises when a seizure contrary to California law occurs in this state, the venture is not lawless, and the government is therefore not profiting from illegal conduct or acting as law-breaker. [*Blair*, 602 *P.*2d at 748 (citations omitted).]

The factual distinctions between *Blair* and this case are both apparent and critical. In *Blair*, the seizure was proper under Pennsylvania as well as federal standards. In this case, New Jersey's standards make the original warrantless seizure improper. In *Blair*, the defendant's expectation of privacy was measured by the standards of the state of his residence. In this case, the expectations are measured by the provisions of New Jersey's Constitution. In *Blair*, the original seizure was "not lawless" and therefore the court was not being "compelled to participate in illegal conduct." In this case, admitting the records into evidence would validate a seizure undertaken contrary to the provisions of our Constitution and thereby directly and significantly contravene the "imperative of judicial integrity" in upholding our Constitution.

Contrary to the State's assertion, suppressing these records from evidence will not "chill" federal-state law enforcement cooperation. Nothing in this decision will, presumably, change the way the FBI does business. Nothing in this decision, or in the facts of this case, would preclude the State Police, in a comparable situation, from obtaining a warrant for the seizure of these types of records. The rules are neither complicated nor difficult to follow. Considering the constitutional imperatives at stake, they do not ask too much of the State Police.

The State's motion for reconsideration of the prior ruling suppressing the records from evidence is herewith denied. Defendants shall submit an appropriate form of order.