STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. PRIMO
V. MOLLICA AND AUGUSTINE FERRONE,
DEFENDANTS–RESPONDENTS.

Argued February 2, 1988—Decided March 16, 1989.

334

*Larry R. Etzweiler*, Deputy Attorney General, argued the cause for appellant (*Cary Edwards*, Attorney General of New Jersey).

*Stephen W. Kirsch*, argued the cause for respondent Augustine Ferrone (*Francis J. Hartman*, attorney; *Stephen W. Kirsch* and *Charles H. Nugent, Jr.*, on the briefs).

*B. Dennis O'Connor* submitted a letter in lieu of brief on behalf of respondent Primo V. Mollica.

The opinion of the Court was delivered by

HANDLER, J.

In this case federal law-enforcement officers without a search warrant obtained hotel billing records relating to the use of an occupant's room telephone. They then turned these records over to state law enforcement officers who, using this information, obtained search warrants and undertook a search of defendants' hotel rooms, seizing evidence of gambling offenses. In the ensuing criminal prosecution two major issues emerged. The first is whether New Jersey's constitutional protections against unreasonable search and seizure extend to hotel billing records relating to a person's use of his or her hotel-room telephone. The second is whether such a state constitutional protection applies when the seizure of such evidence is by federal officers who thereafter transfer the evi-

dence to state officers for prosecutorial use against a defendant.

We conclude that the state constitutional prohibition against unreasonable search and seizure applies to an individual's hotel telephone billing records based on his or her use of a hotel-room telephone. We find nevertheless that when such telephone records are seized by federal officers acting independently of state authorities and in conformity with federal law, this state constitutional protection does not bar subsequent prosecutorial use of those records for such purposes as establishing probable cause for the issuance of search warrants.

## I.

The facts that give rise to the issues on appeal began during June and July of 1983 when the Federal Bureau of Investigation ("FBI") received several anonymous telephone calls advising it that in May of that year one of the defendants, Augustine Ferrone, had operated an illegal bookmaking enterprise from rooms occupied in the Caesars Hotel/Casino ("Caesars") in Atlantic City. The FBI was also told that Ferrone's method of operation included telephone calls from his hotel rooms to numerous bookmakers throughout the country as well as to various sports lines and weather services to obtain the latest point spreads and weather conditions.

The FBI initiated its own independent investigation. Using only the anonymous tips, and without a search warrant, it obtained from Caesars the telephone toll records for Ferrone's rooms during the period of his stay at the hotel. These records confirmed the information given by the anonymous informant. Later, the FBI's anonymous source told it that Ferrone was assisted by the second defendant, Primo Mollica, who was said to occupy a suite of rooms in close proximity to Ferrone's rooms.

In early July of 1983, the FBI turned over this information, including that reflected in the telephone toll records, to the

New Jersey State Police. Based on this evidence, and its own independent confirmation of the fact that Ferrone and Mollica were again occupying rooms at Caesars, the State Police obtained warrants to search these rooms. This search, in turn, resulted in the discovery of paraphernalia and equipment used in bookmaking operations. As a result, defendants were arrested on charges of promoting gambling in violation of *N.J.S. A.* 2C:37–2, and of possession of gambling records in violation of *N.J.S.A.* 2C:37–3(a)(1).

At the trial that followed, defendants claimed that the seizure of the Caesars telephone toll records without a warrant violated their constitutional privilege against unreasonable search and seizure. It was not then asserted by defendants that the investigating police who had obtained the telephone records were federal agents. They argued only that the search warrants obtained by the state authorities were based on illegally seized evidence and therefore must be suppressed. The trial court agreed with these contentions, ruling that hotel telephone toll call billing records relating to an occupant's use of his or her hotel-room telephone were protected under the State Constitution from unreasonable searches and seizures. *See State v. Mollica,* 214 *N.J.Super.* 658, 662 (Law Div.1986) [hereinafter *Mollica* I] (discussing initial ruling). In an unpublished *per curiam* decision on interlocutory appeal, the Appellate Division upheld this ruling.[1] Thereafter, in the face of the contention that the initial seizure of the telephone records was done by FBI agents, the trial court ruled that its prior decision was fully applicable to FBI actions even though the federal officers acted independently of the State Police and in conformity with federal

---

[1]The initial trial court ruling on this issue was based on an understanding that state, rather than federal, officers seized the toll records. Although both trial and appellate courts were informed to the contrary prior to the appellate ruling, that ruling was confined to the trial record before it and thus based on the assumption that state action was involved.

law.[2] *Mollica I, supra,* 214 *N.J.Super.* at 664. The Appellate Division affirmed the trial court's decision applying the state constitutional standards against unreasonable searches and seizures to the seizure of the telephone records by federal officers. *State v. Mollica,* 217 *N.J.Super.* 95 (App.Div.1987). We subsequently granted the State's motion for leave to appeal from this interlocutory order. 108 *N.J.* 214 (1987).

## II.

The major issues posed in this case, namely, whether state constitutional protections against unreasonable search and seizure apply to hotel-room telephone billing records and whether these protections encompass the conduct of federal officers, present a threshold issue. We must determine preliminarily whether one of the defendants in this appeal, Primo Mollica, has standing to challenge the seizure of the telephone toll records involving the hotel room telephone of another individual. This issue arises because the telephone involved was not in Mollica's hotel room, but in that of the co-defendant, Augustine Ferrone.

The State argues that while defendant Mollica has standing to object to the seizure of items from his hotel room pursuant to the State's search warrant, he has no standing to object to the prior warrantless seizure of the hotel telephone toll records. The State claims that because these records related only to the hotel-room telephone of his co-defendant, Mollica is in no position to challenge their seizure despite the fact that they provided a basis for the search warrant covering his rooms.[3]

---

[2]The trial court initially held that it could not rule on the issue as the Appellate Division opinion affirming the suppression of the evidence was the "law of the case." *Mollica I, supra,* 214 *N.J.Super.* at 663. It only later held a factual hearing on this issue after a second interlocutory appeal resulted in an Appellate Division order to do so.

[3]The supplemental affidavit requesting authorization to search Mollica's rooms did not explicitly rely on the telephone toll records. Nevertheless, it did

■■ Ordinarily an individual has standing—indeed, "automatic standing"—to contest the validity of the search and seizure of evidence when "possession of the seized evidence at the time of the contested search is an essential element of guilt[.]" *State v. Alston*, 88 *N.J.* 211, 228 (1981) (a defendant charged with the possessory crime will be deemed to have standing); *see also State v. Curry*, 109 *N.J.* 1, 7–8 (1987) (discussing *Alston*). As the State correctly notes, however, this does not automatically provide that person with standing to object to prior or antecedent state action that was directed against another person. This is true even when that action becomes the basis for a subsequent search and seizure that is in fact directed against the defendant, eventuating in the subsequent seizure of incriminating evidence. As we noted in *State v. Johnson*, 43 *N.J.* 572, 595 (1965), aff'd, 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966), "cases dealing with the introduction of illegally seized evidence against one who was not the victim of the seizure, have consistently held that the person cannot assert the denial of another's rights." *See Wong Sun v. United States*, 371 *U.S.* 471, 492, 83 *S.Ct.* 407, 420, 9 *L.Ed.*2d 441, 458 (1963); *see also Farley v. $168,400.97*, 55 *N.J.* 31, 46–47 (1969) (only party actually victimized by unconstitutional search and seizure has standing to object to it); *State v. Parker*, 153 *N.J.Super.* 481, 488 (App.Div.1977) (defendant with no actual connection to evidence cannot object to its seizure). Therefore, the fact that Mollica has standing to object to the search and seizure of evidence from rooms occupied by him does not, by itself, provide him with standing to object to the earlier seizure of telephone toll records relating not to his but to Ferrone's hotel-room telephone.

---

so implicitly in that it was designated "supplemental" and by reference incorporated the information provided by the affidavit requesting authority to search Ferrone's rooms. This earlier affidavit had relied on the seized telephone toll records.

■■ In assessing whether a defendant has a connection or relationship with evidence sufficient to give him standing to challenge its seizure, this jurisdiction applies a broad standard. In *Alston, supra,* 88 *N.J.* at 228, we upheld, as a matter of state constitutional doctrine, the retention of

> the rule of standing traditionally applied in New Jersey, namely, that a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized.

This standard is one that goes beyond the "legitimate expectation of privacy" test employed in the federal fourth amendment context. *See Rakas v. Illinois,* 439 *U.S.* 128, 99 *S.Ct.* 421, 58 *L.Ed.*2d 387 (1978), reh. den., 439 *U.S.* 1122, 99 *S.Ct.* 1035, 59 *L.Ed.*2d 83 (1979). Under our standard, if Mollica has a "participatory interest" in Ferrone's hotel-room telephone and telephone toll records, he would have a sufficient connection with this evidence to give him standing to object to its seizure despite his lack of any possessory or proprietary interest in the use of the hotel-room telephone.

■ A participatory interest in seized evidence extends beyond the kind of relationship that could otherwise be considered only proprietary or possessory. It rather stresses the relationship of the evidence to the underlying criminal activity and defendant's own criminal role in the generation and use of such evidence. *Compare Alston, supra,* 88 *N.J.* at 230 (occupants of a car that was subject to a general search had standing to challenge seizure of evidence) *with Parker, supra,* 153 *N.J.Super.* at 488 (while suppressing on other grounds evidence seized without a warrant from trunk of car belonging to mother of defendant, court specifically noted that "defendant had no proprietary, possessory or participatory interest in the car and no standing to object to the trunk being opened.").

■ As we recently noted in *Curry, supra,* 109 *N.J.* at 9, neither case nor commentary has fully catalogued the contents of the "participatory interest" test. Unlike the terms "possessory" or "proprietary," which denote property concepts, "parti-

cipatory" connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity. *See Black's Law Dictionary* 1007 (5th ed. 1979). It thus provides standing to a person who, challenging the seizure and prosecutorial use of incriminating evidence, had some culpable role, whether as a principal, conspirator, or accomplice, in a criminal activity that itself generated the evidence.

■ In this case, Mollica is alleged to have participated in the underlying criminal gambling activities that involved the use of Ferrone's hotel-room telephone resulting in the creation of the toll records. By showing that telephone calls had been made in a pattern frequently found in illegal gambling activities, the toll records confirmed the anonymous information that Ferrone's hotel-room telephone was being used for gambling activities. The affidavit requesting a warrant to search Mollica's rooms for evidence of gambling violations was derived in part from the information disclosed by these toll records. There is thus a sufficient connection between the telephone toll records and the underlying criminal gambling for which this defendant is charged, and a sufficient relationship between the defendant and the gambling enterprise, to establish a participatory interest on the part of defendant in this evidence. In sum, the involvement of defendant in criminal gambling activities that generated telephone toll records invests defendant with standing to challenge the validity of the seizure of this evidence.

### III.

The initial substantive issue decided by the courts below is whether the seizure of hotel telephone records of an occupant's room telephone without a search warrant constitutes a violation of state-constitutional standards. The determination of this issue depends on whether the principles of *State v. Hunt*, 91 *N.J.* 338 (1982), are applicable to transient accommodations, such as hotel rooms, and to hotel telephone toll records that are

kept in the regular course of a hotel's business to reflect for billing purposes the use of hotel-room telephones by guests.

In *Hunt*, the Court recognized that telephones are "part and parcel" of homes and offices and "an essential instrument in carrying out our personal affairs." 91 *N.J.* at 346. When telephones are used, we noted,

> it is as if two people are having a private conversation in the sanctity of their living room. It is generally understood to consist of a conversation between two persons, no third person being privy to it in the absence of consent. [*Ibid.*]

Just as one is entitled to assume that the words spoken into a telephone "will not be broadcast to the world[,]" *Katz v. United States*, 389 *U.S.* 347, 352, 88 *S.Ct.* 507, 512, 19 *L.Ed.*2d 576, 582 (1967), so too is one "entitled to assume that the numbers [one] dials in the privacy of [one's] home will be recorded solely for the telephone company's business purposes." *Hunt, supra,* 91 *N.J.* at 347. We acknowledge that the nature of telephone service requires telephone employees gaining access to some of this information. It is, however, expected that the service provided includes keeping this information private and using it solely for limited, and non-personal, business reasons; hence, "[t]he toll billing record is a part of the privacy package[.]" *Ibid.*

A business record, though personal, may not be attended with the degree of privacy expected of purely personal records, and therefore may not enjoy the same level of protection against unreasonable invasion as a record relating to a purely private personal matter. *See, e.g., In re Grand Jury Proceedings of Guarino,* 104 *N.J.* 218 (1986). Nevertheless, not all business records are devoid of genuine privacy expectations. *Id.* at 246–47 (Handler, J., dissenting). Telephone toll records relating to the use of an individual telephone, notwithstanding their function and origin in the business purposes of the telephone company, are surrounded by a high expectation of privacy. Indeed, the basis for *Hunt* was our view that the identity of the persons and places called on the telephone is intensely private in that it may "reveal the most intimate

details of a person's life." *Smith v. Maryland,* 442 *U.S.* 735, 748, 99 *S.Ct.* 2577, 2584, 61 *L.Ed.*2d 220, 231 (1979) (Stewart, J., dissenting). We therefore found that the seizure of telephone call billing records would materially and substantially deny the telephone caller's expectation of privacy and was hence violative of the protection against unreasonable searches and seizures found in our state constitution. *Hunt, supra,* 91 *N.J.* at 347; *see N.J. Const.* of 1947 art. I, para. 7.

"No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California,* 376 *U.S.* 483, 490, 84 *S.Ct.* 889, 893, 11 *L.Ed.*2d 856, 861 (1964) (citations omitted); *see Hoffa v. United States,* 385 *U.S.* 293, 301, 87 *S.Ct.* 408, 413, 17 *L.Ed.*2d 374, 381 (1966) (dicta) ("A hotel room can clearly be the object of Fourth Amendment protection as much as a home or office.") We perceive no basis for distinguishing between the expectation of privacy in telephoning from a home and in telephoning from a hotel room. It is not the ownership or possessory right to the telephone, nor even its location, as such, that creates the expectation of and entitlement to privacy; rather, it is the *use* of the telephone to engage in private and personal conversations that implicates the privacy protection. *See Katz, supra,* 389 *U.S.* at 351–52, 88 *S.Ct.* at 511–12, 19 *L.Ed.*2d at 582 (expectation of privacy not lost by use of public telephone).

The opportunity to use a telephone is clearly an important incident of the occupancy of a hotel room, and therefore occasions the same concerns as the use of a telephone that is incident to the occupancy of a home. We "refuse to endorse ... a shallow constitutional distinction between a home on the one hand and motel rooms on the other ..." *People v. Oliver,* 417 *Mich.* 366, 378, 338 *N.W.*2d 167, 173 (1983) (arrest warrant requirements apply in motel context). As noted by the California Supreme Court in *People v. Blair,* 25 *Cal.*3d 640, 653–54, 602 *P.*2d 738, 746–47, 159 *Cal.Rptr.* 818, 826–27 (1979),

[a]s in the case of a telephone call from a private residence, a hotel guest may reasonably expect that the calls which he makes from his room are recorded by the hotel for billing purposes only, and that the record of his calls will not be transmitted to others without legal process.... [T]he hotel room is in reality a residence, however temporary.

Thus, hotel use of the telephone toll records for billing purposes does not diminish the individual occupant's expectation of privacy in connection with personal use of the telephone any more than does the origination of these records by the telephone company for its business purposes. The mere fact that a hotel staff exists, thus creating an extra circle of persons who have access to toll records for business purposes, does not alter this perception. It is recognized that hotel personnel do not have "the power to waive the constitutional rights of a guest." *People v. Bankhead,* 27 *Ill.*2d 18, 23, 187 *N.E.*2d 705, 707 (1963); *see Sumdum v. State,* 612 *P.*2d 1018, 1021 (Alaska 1980) ("A guest in a motel has a constitutionally protected right to privacy in his motel room and motel personnel cannot consent to a search of a guest's room."); *People v. Gallmon,* 19 *N.Y.*2d 389, 392–93, 280 *N.Y.S.*2d 356, 359–60, 227 *N.E.*2d 284, 286–87 (1967) (rooming house and inn management only permitted to intrude on guest's privacy "for such reasonable purposes as may be necessary in the general conduct of the inn or in attending to the needs of a particular guest."),[4] *cert.* den., 390 *U.S.* 911, 88 *S.Ct.* 832, 19 *L.Ed.*2d 884 (1968). In fact, hotels have an obligation to protect their guests' privacy. *See Campbell v. Womack,* 345 *So.*2d 96, 98 (La.App.), *cert.* den., 347 *So.*2d 247 (1977) (hotels have "an affirmative duty, stemming from a guest's rights of privacy and peaceful possession, not to

---

[4]We note that similar application of privacy standards was used by the California Supreme Court in *Blair, supra,* 25 *Cal.*3d at 653, 602 *P.*2d at 745, 159 *Cal.Rptr.* at 826, which in addition to dealing with toll records also found a right of privacy applying to credit card records. This right was based on similar rulings protecting bank records, *see Burrows v. Superior Court,* 13 *Cal.*3d 238, 529 *P.*2d 590, 118 *Cal.Rptr.* 166 (1974), despite the fact merchant access to the credit card records provided an extra layer of persons, in addition to bank employees, capable of viewing the records.

allow unregistered and unauthorized third parties to gain access to the rooms of a guest.")

"[A]n expectation of privacy consists of a belief that uninvited people will not intrude in a particular way." *United States v. Lyons,* 706 *F.*2d 321, 326 (D.C.Cir.1983) (emphasis omitted). As we have shown, this particular way includes the assumption that the people and places one calls on a telephone, no less than the resulting conversations, will be private. The place where such a call is made does not matter, be it home, office, hotel, or even public phone booth. *See Katz, supra,* 389 *U.S.* at 351–52, 88 *S.Ct.* at 511–12, 19 *L.Ed.*2d at 582 (extending fourth amendment protection to conversation made from a telephone booth). As noted by the Supreme Court in *Katz, supra,* a constitution's search and seizure limitation "protects people, not places." *Ibid.,* 389 *U.S.* at 351, 88 *S.Ct.* at 511, 19 *L.Ed.*2d at 582; *see United States v. Owens,* 782 *F.*2d 146 (10th Cir.1986). As defendants could reasonably expect the toll records to be private, they are therefore entitled to the protections of our State Constitution.

We acknowledged in *Hunt* that our State Constitution's protection of personal privacy extends beyond that embraced by the federal constitution. As the Supreme Court ruled in *Smith v. Maryland, supra,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220, the fourth amendment protects zealously the contents of a telephone conversation but does not protect information or material other than the telephone conversation itself. *See Hunt, supra,* 91 *N.J.* at 343–44 (discussing *Smith* ). Our holding today is the sound and logical continuance of our broader view of the privacy that surrounds the use of a telephone and the extended protection that it deserves. The essence of this perception is the importance of privacy to the individual. In these terms and in the context of search and seizure, we see no reason to differentiate an individual's use of a hotel telephone from telephone calls made elsewhere with regard to the resulting privacy expectations arising from such

use and the necessary protections based on those legitimate expectations.

It therefore follows ineluctably that the official seizure of hotel-telephone billing or toll records relating to a guest's use of a hotel-room telephone is subject to the requirements of antecedent probable cause and the issuance of a search warrant. *See Hunt, supra,* 91 *N.J.* at 348 (police wrongfully obtained toll billing records where these were procured "without any judicial sanction or proceeding."). In this case there was no attempt to show antecedent probable cause for the seizure of these telephone toll records, nor was any search warrant sought or obtained to authorize their seizure. Hence, the seizure of these telephone records is critically vulnerable to a challenge under the State Constitution. Whether that challenge can succeed in this case, however, depends on the applicability of the state constitutional doctrine expressed in *Hunt, supra,* 91 *N.J.* 338, to the seizure of the telephone records by federal agents. This poses the second substantive issue in this appeal.

## IV.

With regard to law-enforcement activities, a state constitution ordinarily governs only the conduct of the state's own agents or others acting under color of state law. It is this fundamental understanding of the jurisdictional reach of state constitutions that has guided courts in determining whether, if at all, a state constitution can be applied to the officers of another state exercising only the lawful authority of that state. This principle is illustrated throughout the abundant case law that has addressed an issue presently before us: the use by officers of one jurisdiction of evidence seized by agents of another jurisdiction acting lawfully pursuant to their own governmental authority and in accordance with legal standards that are less protective than those of the jurisdiction in which the evidence is sought to be used. The historical development

and application of this principle, although complicated by the various stages of extension of the exclusionary rule to federal and state agents, is nonetheless instructive.

The problem of evidence acquired and used respectively by officers who are subject to differing legal standards has been with us a long time. It was raised sharply when the Supreme Court, in *Weeks v. United States*, 232 *U.S.* 383, 34 *S.Ct.* 341, 58 *L.Ed.* 652 (1914), first instituted the exclusionary rule. In doing so, the Court held that the rule would not apply with respect to the conduct of non-federal officers who had not "acted under any claim of federal authority." *Id.* at 398, 34 *S.Ct.* at 346, 58 *L.Ed.* at 658. This was based on the Court's view that "the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach [only] the federal government and its agencies." *Id.* at 398, 34 *S.Ct.* at 346, 58 *L.Ed.* at 658.

For many years, federal standards for lawful searches and seizures were usually more protective than the standards followed by the several states. *See, e.g., Eleuteri v. Richman*, 26 *N.J.* 506, 510–11, 516 (refusal to adopt more protective federal exclusionary-rule standard), *cert.* den. *sub nom. Eleuteri v. Furman*, 358 *U.S.* 843, 79 *S.Ct.* 52, 3 *L.Ed.*2d 77 (1958); *see also State v. Giberson*, 99 *N.J.L.* 85, 87 (E. & A.1923) (finding, prior to incorporation of fourth amendment as applicable to states through fourteenth amendment, that federal constitutional search-and-seizure standards limit federal, not state, powers). This disparity required federal courts to evaluate the etiology of evidence that was turned over to federal officers for federal prosecutorial use after having been seized by state officers. Such an inquiry was necessary to determine whether the state officers, who had obtained the evidence in accordance with state standards less protective than federal mandates, had acted wholly independently of federal officers. Because state officers were not subject to the fourth amendment and its remedial exclusionary rule, it was recognized that any evidence that was independently obtained by state officials could be

"turned over to the federal authorities on a silver platter." *Lustig v. United States*, 338 *U.S.* 74, 69 *S.Ct.* 1372, 93 *L.Ed.* 1819 (1949); *see Byars v. United States*, 273 *U.S.* 28, 47 *S.Ct.* 248, 71 *L.Ed.* 520 (1927). Such evidence could then be used by the federal agents provided they had not violated federal-constitutional standards by participating in the initial seizure.

The essential principle underlying the development of this "silver platter" doctrine is that protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity. As the Supreme Court stated in *Burdeau v. McDowell:* "[the] origin and history [of the fourth amendment] clearly show that it was intended as a restraint upon the activities of a sovereign authority, and was not intended to be a limitation upon other than governmental agencies ..." 256 *U.S.* 465, 475, 41 *S.Ct.* 574, 576, 65 *L.Ed.* 1048, 1051 (1921). This principle explains why the conduct of ordinary citizens acting only in their capacity as private individuals will not trigger the constitutional protections that would otherwise apply if the identical acts were undertaken by government agents exercising governmental authority. *See Couch v. United States*, 409 *U.S.* 322, 331 n. 14, 93 *S.Ct.* 611, 617 n. 14, 34 *L.Ed.2d* 548, 556 n. 14 (1973); *Burdeau v. McDowell, supra*, 256 *U.S.* at 474–76, 41 *S.Ct.* at 575–76, 65 *L.Ed.* at 1050–51; *State v. Frank*, 112 *N.J.Super.* 592 (App.Div. 1971); *see also State v. Droutman*, 143 *N.J.Super.* 322, 328–29 (Law Div.1976) (exclusionary rule inapplicable to searches by private individuals in absence of cooperation with officials).

 By parallel reasoning, a state's constitution that will not be invoked to control the conduct of its private citizens will not be applied to control the conduct of the officers of a foreign jurisdiction. *See Commonwealth v. Wallace*, 356 *Mass.* 92, 95, 248 *N.E.2d* 246, 248 (1969) (statements obtained by Canadian police treated just like statements related by private citizens in United States); *State v. Olsen*, 212 *Or.* 191, 317 *P.2d* 938 (1957) (search in Washington by Washington police, independent of

Oregon agents, is analogous to search by private individuals); *Kaufman v. State,* 189 *Tenn.* 315, 320, 225 *S.W.*2d 75, 77 (1949) (officers of other state jurisdictions treated as being "in the same plight ... as private citizens ...").[5] The law-enforcement officers of another state jurisdiction have been analogized to the private citizens of the forum jurisdiction in terms of the applicability of the latter's constitutional restrictions. *See, e.g., Pooley v. State,* 705 *P.*2d 1293, 1301 (Alaska App.1985) (Alaska court allows admission of evidence obtained in Alaska through actions of California official in California airport that might have violated Alaska state constitution); *People v. Phillips,* 41 *Cal.*3d 29, 79–80, 711 *P.*2d 423, 455–57, 222 *Cal.Rptr.* 127, 160 (1985) (California court allows admission of evidence obtained through Utah officials' inspection of inmate's mail in Utah jail, although such inspection illegal under California law); *McClellan v. State,* 359 *So.*2d 869, 873 (Fla.App.1978) (evidence seized in Alabama pursuant to valid Alabama search warrant held admissible in Florida trial despite invalidity of warrant under Florida standards), *cert.* den., 364 *So.*2d 892 (1978).

This treatment of officers of another jurisdiction with respect to the admissibility of evidence seized by such officers is analogous to the treatment accorded the officers of a foreign country, who, in the exercise of their own government's authority, are not subject to the federal constitution. *See United States v. Calloway,* 446 *F.*2d 753, 755 (3d Cir.1971), *cert.* den. *sub nom. Devyver v. United States,* 404 *U.S.* 1021, 92 *S.Ct.* 694, 30 *L.Ed.*2d 670 (1972) (upholding admission of evidence secured by Canadian police; although search inadequate by

---

[5]*Olsen* and *Kaufman* predate extension of the exclusionary rule to state officers. *See Mapp v. Ohio,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961). Accordingly, subsequent caselaw has modified these decisions to ensure that searches and seizures by officers of any state conform at least to threshold federal standards that would not apply to actions by private citizens. *See State v. Krogness,* 238 *Or.* 135, 388 *P.*2d 120 (1963), *cert.* den., 377 *U.S.* 992, 84 *S.Ct.* 1919, 12 *L.Ed.*2d 1045 (1964); *Ellis v. State,* 211 *Tenn.* 321, 364 *S.W.*2d 925 (1963).

fourth amendment standards, it did not "shock the conscience" of court); *Brulay v. United States,* 383 *F.*2d 345, 348 (9th Cir.1967) (admission in federal court of evidence seized in Mexico pursuant to warrantless search; neither fourth nor fourteenth amendments directed at officers of foreign nation), *cert.* den., 389 *U.S.* 986, 88 *S.Ct.* 469, 19 *L.Ed.*2d 478 (1967); *State v. Ford,* 108 *Ariz.* 404, 411–12, 499 *P.*2d 699, 706–07 (1972) (Canadian police not subject to fifth amendment requirements), *cert.* den. *sub nom. Ford v. Arizona,* 409 *U.S.* 1128, 93 *S.Ct.* 950, 35 *L.Ed.*2d 261 (1973); see *Commonwealth v. Wallace, supra,* 356 *Mass.* 92, 248 *N.E.*2d 246; *see also Stonehill v. United States,* 405 *F.*2d 738, 743 (9th Cir.1968) ("silver platter" reasoning used when refusing to suppress evidence seized by foreign agents in manner contrary to United States standards), *cert.* den., 395 *U.S.* 960, 89 *S.Ct.* 2102, 23 *L.Ed.*2d 747 (1969); *People v. Helfend,* 1 *Cal.App.*3d 873, 886–88, 82 *Cal.Rptr.* 295, 304–05 (1969) (same), *cert.* den. *sub nom. Helfend v. California,* 398 *U.S.* 967, 90 *S.Ct.* 2182, 26 *L.Ed.*2d 551 (1970).

The critical element in these lines of cases is the agency *vel non* between the officers of the forum state who seek to use the evidence and the officers of the state who obtained the evidence. It is this element—the presence or absence of agency between the officers of the two sovereigns—that determines the applicability of the constitutional standards of the forum jurisdiction. This is illustrated by early cases in which the courts of a state chose to dismiss or not address contentions of illegality of the seizure under its constitutional standards because its own officers were not involved in the seizure. *See, e.g., People v. Touhy,* 361 *Ill.* 332, 347, 197 *N.E.* 849, 857 (1935) (refusing to suppress evidence seized by Wisconsin police as "[t]he seizure was not made or authorized by any officer of [Illinois.]"); *Young v. Commonwealth,* 313 *S.W.*2d 580, 581 (Ky.1958) (Kentucky court admits evidence seized by Missouri officers in Missouri although seizure contravened Kentucky and Missouri constitutions). As noted by the court in *Young, supra,* 313 *S.W.*2d at 581, in the era before extension of federal

search-and-seizure standards to the states, a state-constitutional exclusionary rule was founded on violations of the state constitution by its *own* officers or their agents. "Without encroachment upon our [state] constitutional guarantee [against unreasonable searches and seizures] we lose the reason for the rule." *Ibid.*[6]

The essential dynamic of the silver platter doctrine remains pertinent in the context of the parallel jurisdiction that is exercised by federal and state officers within the territorial boundaries in each of the several states. However, as a result of *Wolf v. Colorado*, 338 *U.S.* 25, 69 *S.Ct.* 1359, 93 *L.Ed.* 1782 (1949), which held that fourth amendment search-and-seizure standards were applicable to the states through the fourteenth amendment, the application of the doctrine changed from its pristine form, exemplified by *Byars* and *Lustig.* In light of *Wolf,* the Supreme Court, in *Elkins v. United States*, 364 *U.S.* 206, 212, 213, 80 *S.Ct.* 1437, 1442, 4 *L.Ed.*2d 1669, 1675 (1960), observed that "[t]he foundation upon which the admissibility of state-seized evidence in a federal trial originally rested—that unreasonable state searches did not violate the Federal Constitution—thus disappeared in 1949." With the uniform extension

---

[6]Different considerations arise in situations in which an officer has violated the legal standards of his or her own state, which standards are more protective than those of the state in which the officer's conduct is being challenged. In that setting, under choice-of-law doctrine, a state's own standards may be applied. *See, e.g., People v. Orlosky,* 40 *Cal.App.*3d 935, 115 *Cal.Rptr.* 598, 601 (1974) (California has stronger governmental interest in using its own less protective exclusionary rule than situs state has in applying its more protective rule with respect to evidence seized by its officers contrary to its own law but not California law); *People v. Saiken,* 49 *Ill.*2d 504, 509, 275 *N.E.*2d 381, 385 (1971) (finding Illinois' narrower, less-protective standards apply inasmuch as it has a more "significant relationship" to crime, defendant witnesses, and location of prosecution than sister state where evidence was seized), *cert.* den. *sub nom. Saiken v. Illinois,* 405 *U.S.* 1066, 92 *S.Ct.* 1499, 31 *L.Ed.*2d 796 (1972); *see also Burge v. State,* 443 *S.W.*2d 720, 723 (Tex.Crim.App.) (viewing exclusionary rule as one of procedure and thus applying state's own narrower rule rather than other state's broader rule), *cert.* den. *sub nom. Burge v. Texas,* 396 *U.S.* 934, 90 *S.Ct.* 277, 24 *L.Ed.*2d 233 (1969).

of the exclusionary rule to evidence offered in all of the state courts, traditional silver platter applications and considerations of intergovernmental agency were no longer necessary to sterilize evidence gathered in violation of fourth amendment standards. *See Mapp v. Ohio, supra,* 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081.

This era of constitutional homogeneity faded, however, when various states began to establish search-and-seizure standards more protective than the minimum standards derived from the fourth amendment. *See, e.g., State v. Johnson,* 68 *N.J.* 349 (1975). With this development of differing standards, the silver platter doctrine surfaced in situations implicating the parallel jurisdiction of federal and state officers. It again became necessary as a condition for use in a state court to sanitize evidence that may have been obtained under less protective federal-constitutional standards. However, the polarity of the transfer process was reversed. Instead of evidence being transferred to federal officers from state officers working under more lenient local standards, evidence might now flow to state officers from federal officers governed by more lenient standards.

As with the earlier manifestations of the silver platter doctrine, and as seen in the numerous post-*Mapp* examples of interstate transfers of evidence, the salient factor continues to be agency *vel non* between the officers of the respective jurisdictions. The nature of the relationship between the officers participating in the search or seizure and the officers seeking to make use of such evidence is critical.

Because federal officers necessarily act in the various states, but in the exercise of federal jurisdictional power, pursuant to federal authority and in accordance with federal standards, state courts treat such officers as officers from another jurisdiction. *See State v. Bradley,* 105 *Wash.*2d 898, 719 *P.*2d 546 (1986) (neither state law nor state constitution controls federal officer's conduct in border search, which is equivalent to search conducted in a different jurisdiction). This under-

standing obtains even though the conduct of such officers would not satisfy the requirements of the state's constitution. *See Morales v. State,* 407 *So.*2d 321 (Fla.App.1981) (evidence seized by Coast Guard in manner inconsistent with state standards is admissible in state criminal trial); *State v. Dreibelbis,* 147 *Vt.* 98, 511 *A.*2d 307 (1986) (affirming conviction for transporting drugs within state when evidence used was obtained by federal officers using methods consistent with federal standards, although impermissible by Vermont standards). Stated simply, state constitutions do not control federal action.

 Recognition of this inherent jurisdictional limitation on the application of the state constitution is consonant with principles of federalism. It is now firmly recognized that state constitutions do not simply mirror the federal constitution; they are a basis for independent rights and protections that are available and applicable to the citizens of the state. *See Pruneyard Shopping Center v. Robins,* 447 *U.S.* 74, 100 *S.Ct.* 2035, 64 *L.Ed.*2d 741 (1980). Reflecting this, states have the power to impose higher standards than required by the federal constitution. *See Cooper v. California,* 386 *U.S.* 58, 87 *S.Ct.* 788, 17 *L.Ed.*2d 730 (1967).

We have in many areas acknowledged in our State Constitution protections that exceed those provided under the federal constitution. *See, e.g., State v. Gerald,* 113 *N.J.* 40 (1988); *Right to Choose v. Byrne,* 91 *N.J.* 287 (1982). This is particularly true with respect to the right to be free from unreasonable search and seizure. *See, e.g., State v. Slockbower,* 79 *N.J.* 1 (1979); *State v. Johnson, supra,* 68 *N.J.* 349. *Compare,* respectively, *e.g., State v. Novembrino,* 105 *N.J.* 95 (1987) (refusing to permit good faith exception to exclusionary rule); *State v. Alston, supra,* 88 *N.J.* 211 (passengers have standing to object to auto searches) *with, e.g., United States v. Leon,* 468 *U.S.* 897, 104 *S.Ct.* 3405, 82 *L.Ed.*2d 677 (1984) (finding good-faith exception to federal exclusionary rule); *Rakas, supra,* 439 *U.S.* 128, 99 *S.Ct.* 421, 58 *L.Ed.*2d 387 (denying

automobile passenger standing). Significantly, in terms of the protections that govern this case, we have found greater security in our constitution than is available under the federal constitution with respect to the privacy interest in toll records of an individual's use of a telephone. *Compare* our decision today, *supra* at 340–345 *and State v. Hunt, supra*, 91 *N.J.* 338 *with Smith v. Maryland, supra*, 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220.

 Because the constitution of a state has inherent jurisdictional limitations and can provide broader protections than found in the United States Constitution or the constitutions of other states, the application of the state constitution to the officers of another jurisdiction would disserve the principles of federalism and comity, without properly advancing legitimate state interests. Such considerations also serve in large measure to explain why it does not offend the constitutional principles of a forum jurisdiction to allow the transfer of criminal evidence from the officers of another jurisdiction to those of the forum when the evidence has been obtained lawfully by the former without any assistance by the latter.

 In determining the validity of a search and seizure conducted by officers of another jurisdiction, the critical assumption that obviates the application of the state constitution is that the state's constitutional goals will not thereby be compromised. In our jurisdiction, we recognize that an essential objective of our constitutional protection against unreasonable search and seizure and the remedial exclusionary rule is to deter unlawful police conduct. *See Delguidice v. New Jersey Racing Comm'n*, 100 *N.J.* 79 (1985). These constitutional protections may also implicate concerns of judicial integrity. *Id.* at 88–89. Further, the exclusionary rule serves to vindicate the impairment of an individual's state constitutional right to be free from unreasonable search and seizure. *State v. Novembrino, supra*, 105 *N.J.* 95.

None of these constitutional values, however, is genuinely threatened by a search and seizure of evidence, conducted by the officers of another jurisdiction under the authority and in conformity with the law of their own jurisdiction, that is totally independent of our own government officers. Thus, in that context, no purpose of deterrence relating to the conduct of state officials is frustrated, because it is only the conduct of another jurisdiction's officials that is involved. *See, e.g., Pooley, supra,* 705 *P.*2d at 1302–03. Judicial integrity is not imperiled because there has been no misuse or perversion of judicial process. *See, e.g., Phillips, supra,* 41 *Cal.*3d at 79–80, 711 *P.*2d at 455–57, 222 *Cal.Rptr.* at 160. Further, no citizen's individual constitutional rights fail of vindication because no state official or person acting under color of state law has violated the State Constitution. *See Burdeau, supra,* 256 *U.S.* at 475, 41 *S.Ct.* at 576, 65 *L.Ed.* at 1051.

In this case, the telephone toll records relating to the use of Ferrone's hotel-room telephone were obtained by federal agents exercising federal authority in a manner that was in conformity with federal standards and consistent with federal procedures. *See Smith v. Maryland, supra,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220. Once seized legally, no legal prohibition barred the interjurisdictional transfer of this evidence. *See United States v. Lester,* 647 *F.*2d 869, 875 (8th Cir.1981) ("Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for use different from that for which it was originally taken."), *quoted in* 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 1.6, at 119 (2d ed. 1987). There was no federal restriction against such a transfer.[7] Nor was there any state-constitutional, statutory, or

---

[7]The State argues that under Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C.S. §§ 2510–20, Congress has specifically authorized the FBI both to seize telephone toll records and to share them with state authorities. Therefore, it claims that the Supremacy Clause of the federal constitu-

regulatory proscription against the receipt of such evidence. Thus, in constitutional terms, the transfer can be analogized to transfers from private citizens, which do not implicate constitutional limitations. *See United States v. Jacobsen,* 466 *U.S.* 109, 113, 117–18, 104 *S.Ct.* 1652, 1656, 1658–59, 80 *L.Ed.*2d 85, 94, 96–97 (1984) (both the seizure of evidence by a private citizen not acting with the knowledge of the government and the transfer of such evidence to government authorities do not implicate search-and-seizure standards).

We endorse the principle that federal officers acting lawfully and in conformity to federal authority are unconstrained by the State Constitution, and may turn over to state law enforcement officers incriminating evidence, the seizure of which would have violated state constitutional standards. This holding, however, is subject to a vital, significant condition. When such evidence is sought to be used in the state, it is essential that the federal action deemed lawful under federal standards not be alloyed by any state action or responsibility. We are required therefore to determine whether in any legally significant degree the federal action can or should be considered state action.

## V.

 This case thus requires us to consider the implications of the silver platter doctrine and its key element: intergovernmental agency. An important aspect of this determination is whether for constitutional purposes the federal agents can be said to be acting under the "color of state law." The assessment of the agency issue necessarily requires an examination of the entire relationship between the two sets of government actors no matter how obvious or obscure, plain or subtle, brief or prolonged their interactions may be. The reasons and the motives for making any search must be examined as well as the

tion, Article VI, clause 2, pre-empts our ability to act in this area. We do not reach this issue inasmuch as we find other grounds for not suppressing the evidence seized by the FBI.

actions taken by the respective officers and the process used to find, select, and seize the evidence.

Our answer to this kind of question can be informed by silver platter decisions in the era before *Elkins*. Many of these considered the significance of the relationship between federal and state officers in the search and seizure of evidence in determining the applicability of more protective federal-constitutional standards to actions by state officers. As earlier noted, the critical element in the application of the silver platter approach was the agency *vel non* between the officers of the respective jurisdictions. See discussion, *supra* at 349–350, 351. *See, e.g., Lustig, supra,* 338 *U.S.* at 78, 69 *S.Ct.* at 1374, 93 *L.Ed.* at 1823 (searches are functional rather than merely physical processes; therefore, joint operation found where federal officer joined in search by state officers before search was complete); *Gambino v. United States,* 275 *U.S.* 310, 318–19, 48 *S.Ct.* 137, 139, 72 *L.Ed.* 293, 297 (1927) (suppression of evidence seized by state officers acting solely on behalf of federal agents); *see also Stonehill v. United States, supra,* 405 *F.*2d at 743, 746 (discussing standards for determining when foreign officers act as agents of federal officers); *Frank, supra,* 112 *N.J.Super.* at 594 (private individual can act as agent for state officers). Differing relationships and interactions may suffice to establish agency. Thus, antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency. *See, e.g., Shurman v. United States,* 219 *F.*2d 282 (5th Cir.) (refusing to find joint operation where federal agent merely informed state officer of suspicion that defendant's car contained narcotics, without requesting any action), *cert.* den., 349 *U.S.* 921, 75 *S.Ct.* 661, 99 *L.Ed.* 1253 (1955); *Droutman, supra,* 143 *N.J.Super.* at 328–29 (search and seizure by private citizen

not subject to constitutional limitations as government had no preknowledge and did not acquiesce in search); *see also, e.g., Corngold v. United States*, 367 *F*.2d 1 (9th Cir.1966) (airline employee said to have been acting in joint operation with federal customs officer where he would not have conducted a search but for the insistence of the federal agent). This inquiry thus will always pose a fact-sensitive exploration that is influenced greatly by the surrounding circumstances.

Here, the trial court examined the actual relationship between the federal and state police officers in terms of the initial search and seizure of the hotel telephone toll records. Its factual findings would lead to the conclusion that the federal officers were not the agents of our state police. *See Mollica I, supra,* 214 *N.J.Super.* at 664. There may well be in this record facts sufficient to justify the conclusion that there was an insufficient connection between the respective officers, thus permitting the state's prosecutorial use of the seized evidence. Nevertheless, the trial court invalidated the search and seizure, and resultant turn-over of the telephone toll records. It may have assumed under all the circumstances that the connection between federal and state officers, such as it was, justified application of the State Constitution. We cannot be sure of the intended effect of the trial court's findings in light of our opinion, which reformulates the standards governing the application of the State Constitution and explains the heightened significance of intergovernmental agency and cooperation in the acquisition of criminal evidence. It is therefore appropriate to remand the matter to the trial court to enable it to reconsider its findings or determine anew the issues of intergovernmental cooperation, agency and state action either on the existing or a supplemental record.

## VI.

In conclusion, we hold that our state-constitutional protections against unreasonable search and seizure apply fully to the

telephone billing records of a hotel relating to an individual guest's use of his or her hotel-room telephone. We also rule that a person who, with the guest, engaged in criminal activities involving the use of a telephone has a sufficient participatory interest in the prosecutorial use of the telephone records to provide him or her with standing to challenge the validity of the seizure of such evidence.

We further hold that our state-constitutional protections against unreasonable searches and seizures do not govern the legality of the actions of federal officers with respect to their search and seizure of evidence, provided that their conduct is pursuant to federal authority and consistent with applicable federal law, and provided further they have acted independently and without the cooperation or assistance of our own state officers with respect to the seizure of such evidence.

In this case, the relationship between the federal officers and the State Police was not sufficiently developed or examined to ascertain whether the federal officers were acting "under color of state law." The matter therefore must be remanded to enable the trial court to determine that relationship and its effect on the validity of the search and seizure of the evidence and its prosecutorial use.

Accordingly, the order suppressing the evidence is stayed pending the remand. We do not retain jurisdiction.

STEIN, J., concurring.

I join in the majority opinion's conclusion that the use by the State Police of hotel telephone billing records obtained from federal agents to establish probable cause for the issuance of search warrants does not offend our State Constitution. I do not read the majority opinion to be dispositive of the question whether any use of such records, including their admissibility into evidence in a State criminal prosecution, would be permitted under our State Constitution. Subject to that qualification, I concur in the opinion of the Court.

CLIFFORD and POLLOCK, JJ., join in this. opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices HANDLER, O'HERN and GARIBALDI–4.

*Concurring in result*—Justices CLIFFORD, POLLOCK and STEIN–3.